IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


**MICHAEL CALLAGHAN,**

     Plaintiff,


v.                                                             Civil Action No. 2:12-3419


**NATALIE E. TENNANT,**
in her official capacity as
West Virginia Secretary of State;
**NATALIE E. TENNANT,**
**GARY A. COLLIAS, WILLIAM N.**
**RENZELLI, and ROBERT RUPP** in
their official capacities as members
of the West Virginia State Election
Commission,

     Defendants.


## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

     Plaintiff Michael Callaghan, for his Complaint against Defendants, states the following:


### Introduction

     1.    This is a civil action for declaratory and injunctive relief arising under the Constitution of the United States. Plaintiff claims that the West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program, W.Va. Code § 3-12-1, et seq. ("the Act"), which provides for matching funds to publicly financed

candidates for the Supreme Court of Appeals of West Virginia, violates the First and Fourteenth Amendments to the United States Constitution by unduly impinging upon protected political speech and association as set forth in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 131 S. Ct. 2806 (2011).

2.     The Act creates a pilot project for public financing for the 2012 election for two seats on the Supreme Court of Appeals of West Virginia.  The Act provides for candidates who choose to participate to receive the sum of $350,000.00 for a contested general election.  W.Va. Code § 3-12-11(b)(1).  In addition, the Act and its accompanying regulations provide that if either a non-participating candidate, a person conducting an independent expenditure, or a combination thereof spend more than $420,000.00, the participating candidate is eligible to receive dollar for dollar contributions of taxpayer dollars of the sums expended in excess of $350,000 up to an additional $700,000.00.     W.Va. Code § 3-12-11(e)-(i); W.V.C.S.R. § 146-5-8.8.

3.     After *Bennett,* it is clear that the matching funds provisions of the Act are unconstitutional.  The *Bennett* Court specifically held that providing public funds to match dollar for dollar the campaign expenditures of privately financed candidates and third-parties conducting independent expenditures imposes a substantial burden on the speech of privately financed candidates and third party contributors by penalizing privately financed candidates and third-parties dollar for dollar based on their speech.  131 S. Ct. at 2818-20.

4.     Plaintiff seeks to have W.Va. Code § 3-12-11(e)-(i) and W.V.C.S.R. § 146-5-8.8 declared unconstitutional under the First and Fourteenth Amendments because those provisions chill them from exercising their First Amendment rights. Plaintiff also seeks to have enforcement of these provisions permanently enjoined. This issue should be resolved promptly so that Plaintiff and those similarly situated will not be chilled in their free expression and association and instead will remain free to engage in constitutionally-protected political expression in the upcoming election.

## Jurisdiction and Venue

5.     This action arises under Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the Constitution of the United States.

6.     The jurisdiction of this Court over the claims arising under 42 U.S.C. § 1983 is founded upon 28 U.S.C. § 1343(a). The jurisdiction over the claims arising under the First and Fourteenth Amendments is founded upon 28 U.S.C. §§ 1331 and 1343(a).

7.     Venue in this district is proper under 28 U.S.C. § 1391(b)(1) because the defendants have been named in their official capacities as Secretary of State and members of the West Virginia State Elections Commission ("Commission"). "Where a public official is a party to an action in his official capacity, he resides in the judicial district where he maintains his official residence, that is, where he performs his official duties." *Republican Party of N.C. v. Martin,* 682 F. Supp. 834,

836 (M.D.N.C. 1988) (citation omitted).  The Secretary of State and the Commission maintain their official offices in Charleston, West Virginia, and meet in Charleston when making determinations regarding the Act. Alternatively, venue is proper as several of the Defendants reside in this District and all of the Defendants are residents of this State.  Finally, venue is appropriate under the provisions of 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District and the decisions under challenge were substantially made at the West Virginia State Capitol in Charleston, West Virginia.

### Parties

8.      Plaintiff Callaghan is a practicing attorney and small business owner. Plaintiff makes contributions to candidates for elected office in West Virginia and wishes to make contributions to the two non-participating candidates nominated by the Democratic Party for the 2012 election to the Supreme Court of Appeals of West Virginia. Because the contributions would trigger matching funds to one of the opposing candidates, Plaintiff will not do so.

9.      Plaintiff also opposes the use of taxpayer money to finance elections. Plaintiff, together and in combination with others, wishes to conduct independent expenditures in favor of candidates who oppose public financing and/or in opposition to candidates who accept public funds to support their campaigns.

10.      Defendant Tennant is the West Virginia Secretary of State.  As such, she is the chief election officer and a member of the Commission.  Defendant Rupp is the Chairman of the Commission.  Defendants Collias and Renzelli are members

of the Commission.  There is currently one vacancy on the Commission resulting in an even number of members.  The Defendants as the members of the Commission are charged with the responsibility of administering the Act and the taxpayer funds making up the Supreme Court of Appeals Public Campaign Financing Fund.  W.Va. Code § 3-12-5.

## Facts

### A.     The 2012 Race for the Supreme Court of Appeals.

11.     The "West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program" was established in 2010 as a pilot program for the 2012 primary election and the 2012 general election for the office of Justice of the Supreme Court of Appeals.  W.Va. Code § 3-12-1.  In 2012, the voters will elect two of the five Justices to twelve-year terms.   The Act sunsets following this election.

12.     Eight candidates sought nomination in the May 8, 2012 West Virginia primary.  Only one candidate, Allan Loughry, sought to participate in the pilot project.

13.     In the primary, Loughry and John Yoder received the Republican Party nominations in an uncontested primary.  Current Justice Robin Jean Davis and candidate Letitia "Tish" Chafin received the Democratic Party's nominations after receiving the two highest vote totals of the six candidates seeking the nomination.

14.     Loughry raised $36,395.00 in order to qualify for the taxpayer subsidies provided by the pilot project.   As a participating candidate in an

5

uncontested primary, he received $13,705.00 from the public fund.  *See* W.Va. Code § 3-12-11(a)(2).  Loughry's April 6, 2012 campaign finance report filed with Secretary Tennant shows receipt of these funds.

15.    Once Loughry was certified as a nominee, the Commission authorized the distribution of $350,000.00 in public funds to Loughry, the amount available to a participating candidate in a contested election.  *See* W.Va. Code § 3-12-11(b)(1).  Loughry's June 19, 2012 campaign finance report filed with Secretary Tennant shows receipt of these funds.

16.    The contested 2012 Democratic primary resulted in expenditures substantially in excess of $350,000.00 by the two nominees.

17.    The Democratic primary for the two seats on the Supreme Court of Appeals was one of few statewide contested elections and the only statewide election that resulted in substantial mass media purchases.  As a result, mass media rates did not increase as a result of the campaign purchases.

18.    The general election, however, contains a number of contested races where the candidates are purchasing or likely to purchase media including the races for President of the United States, United States Senate, Governor, and Attorney General.  Some of these races have attracted or may in the future attract third-party media expenditures.  Moreover, as a number of our media markets serve multi-state areas, West Virginia candidates are competing with candidates in border states for media time.  As a result of the forgoing, media rates are increasing and will cost all candidates more money than the purchases in the primary.

6

B.    *The Act's Provisions for Matching Funds.*

19.    The Act contains several provisions that purport to provide matching funds to candidates participating in the pilot project:

> (e) If the commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that a nonparticipating candidate's campaign expenditures or obligations, in the aggregate, have exceeded by twenty percent the initial funding available under this section any certified candidate running for the same office, the commission shall authorize the release of additional funds in the amount of the reported excess to any opposing certified candidate for the same office.

> (f) If the State Election Commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that independent expenditures on behalf of a nonparticipating candidate, either alone or in combination with the nonparticipating candidate's campaign expenditures or obligations, have exceeded by twenty percent the initial funding available under this section to any certified candidate running for the same office, the commission shall authorize the release of additional funds in the amount of the reported excess to any certified candidate who is an opponent for the same office.

> (g) If the commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that independent expenditures on behalf of a certified candidate, in combination with the certified candidate's campaign expenditures or obligations, exceed by twenty percent the initial funding available under this section to any certified candidate running for the same office, the State Election Commission shall authorize the release of additional funds in the amount of the reported excess to any other certified candidate who is an opponent for the same office.

W.Va. Code § 3-12-11.

20.    A participating candidate in a contested general election can receive up to $700,000.00 in additional public funds triggered by expenditures by nonparticipating candidates or independent expenditures.  W.Va. Code § 3-12-11(h).

7

21. Once it has been determined by the Commission that the matching funds provisions have been triggered, the funds must be issued to the participating candidate within two business days. W.Va. Code § 3-12-11(i).

22. While the Act is not clear on the question, the regulations enacted implementing the Act make it clear that an expenditure of one dollar in excess of the 20% threshold results in the participating candidate receiving contributions matching the nonparticipating candidate's expenditures in excess of $350,000.00 up to an additional $700,000.00 in public funds. W.V.C.S.R. § 146-5-8.8(d).

23. The regulations contain reporting requirements for nonparticipating candidates and persons conducting independent expenditures in the 2012 Supreme Court general election. W.V.C.S.R. § 146-5-12.2 (nonparticipating candidates); *id.* at § 146-5-13 (independent expenditures).

24. Under these regulations, nonparticipating candidates were required to report to the Secretary of State by July 7, 2012, "a listing of expenditures and obligations incurred since May 9, 2012 through July 1, 2012, if those expenditures and obligations, in the aggregate, exceed $350,000." *Id.* at § 12.2.a.

C. *Litigation over Matching Fund Provisions in Public Campaign Financing Statutes.*

25. The West Virginia Act was based on Article 22D of North Carolina's "Elections and Election Laws," G.S. §§ 163-278.62 through 163-278.70, which became effective in 2002. Litigation challenging the constitutionality of the North Carolina law commenced in 2006. Ultimately, the United States Court of Appeals for the Fourth Circuit upheld the constitutionality of the North Carolina statute.

8

*North Carolina Right To Life Committee Fund For Independent Political Expenditures v. Leake*, 524 F.3d 427 (4th Cir. 2008). The Supreme Court of the United States denied certiorari. 555 U.S. 994 (2008).

26.    The West Virginia Act was enacted in 2010.  A year after its enactment,  the Supreme Court of the United States decided *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 131 S. Ct. 2806 (2011).  In *Bennett,* the Court applied strict scrutiny and struck down Arizona's matching funds provision which applied only to legislative and executive races.  Notably, in striking down the Arizona statute, the Supreme Court in *Bennett* specifically characterized the North Carolina act as having "matching funds statutes that resemble Arizona's law." *Id.* at 2816 n.3.

27.    Following the decision in *Bennett,* the Commission sought an opinion of the West Virginia Attorney General regarding the constitutionality of the matching funds provision of the West Virginia Act.   The Attorney General responded on July 28, 2011, concluding that the Act's matching funds provision could not survive the strict scrutiny analysis mandated by *Bennett.*  The Attorney General's opinion is attached as Exhibit A.

28.    Following the receipt of the Attorney General's opinion, the Secretary of State publicly announced that she intended to follow the Attorney General's opinion and not implement the matching funds provisions of the Act.

29.    Following *Bennett,* the North Carolina matching provisions for judicial elections, were again challenged.  On May 18, 2012, the United States District

Court for the Eastern District of North Carolina granted the plaintiffs' motion for summary judgment and found the North Carolina matching provisions unconstitutional based on *Bennett.  See NCRL PAC v. Leake,* No. 11-CV-472-FL [Doc. 41] (E.D.NC. 2012) (attached as Exhibit B).

### D.  Post-Primary Election Commission Proceedings.

30.   On June 21, 2012, Loughry appeared at a regularly scheduled meeting of the Commission and requested that the Commission take a position on whether it would fully implement the matching funds provision.  The Commission refused to take a position.

31.   On June 22, 2012, the disclosure provision set forth in W.V.C.S.R. 146-5-12.2 was implemented through the promulgation of a reporting form.  The nonparticipating candidates were notified by e-mail of the new form and the requirement that it be filed by July 6, 2012.

32.   While § 12.2 of the regulations contemplates disclosure once expenditures exceed $350,000.00, the form provided to the candidates by the Secretary's election division required disclosure only when candidates expended or committed $420,000.00, the trigger for the additional payments.

33.   On July 6, 2012, Justice Davis, a nonparticipating candidate, filed the form provided to the nonparticipating candidates.  Her filing showed expenditures of $494,471.00.  *See* Exhibit C.

34.   On July 17, 2012, an emergency meeting of the Commission was held in Charleston, West Virginia.  The Commission voted to acknowledge that Justice

Davis had expended sufficient sums to trigger the matching funds provisions under the Act. The Commission then proceeded to vote on a motion to authorize the release of matching funds to Loughry. The motion failed on a tie vote of the four members. The debate against the motions centered around the constitutionality of the matching provisions. The debate over the motion makes it clear that the members of the Commission would welcome a judicial decision from this Court finally resolving the constitutionality of the matching provisions of the Act.

35.   Following the vote, Commission Chairman Rupp requested that the Governor fill the vacancy on the Commission to prevent ties in Commission voting.

36.   The uncertainty regarding whether the Commission will ultimately vote to release matching funds to Loughry unconstitutionally burdens Plaintiff by threatening the direct and automatic release of public money to their publicly financed opponent. As a direct and proximate result of the Act's matching funds provision, Plaintiff's willingness to engage in protected political speech has been chilled.

37.   Although Plaintiff would like to make candidate contributions and independent expenditures in this election, he will not exercise his First Amendment rights because of the speech-chilling effects of the Act's matching funds law.

38.   Plaintiff has no adequate remedy at law.

## COUNT I

### THE ACT'S MATCHING FUND SCHEME SUBSTANTIALLY BURDENS POLITICAL SPEECH AND IS NOT NARROWLY TAILORED TO SERVE A COMPELLING INTEREST

39.     Plaintiff realleges the preceding paragraphs.

40.     W.Va. Code § 3-12-11 and W.V.C.S.R. § 146-5-8.8 provide for the provision of matching public funds to the publicly financed candidate whenever expenditures by the privately financed candidates individually or in combination with independent expenditures by third parties exceed the sum of $420,000.00 in the general election.

41.     Thereafter, this matching funds scheme provides a direct, dollar-for-dollar public subsidy to participating candidates whenever an independent expenditure is made that either opposes a participating candidate with a nonparticipating opponent, or supports a nonparticipating candidate with a participating opponent or whenever the privately financed candidate expends personal or donated funds.  As a result, the privately financed candidate must "shoulder a special and potentially significant burden" when choosing to exercise his First Amendment right to spend funds on his own candidacy.  *Bennett,* 131 S.Ct. at 2818 (internal quotations omitted). Moreover, "[t]he burdens that matching funds impose on independent expenditure groups are akin to those imposed on the privately financed candidates themselves." *Bennett,* 131 S.Ct. at 2819.

42.     Under the First Amendment to the U.S. Constitution and *Bennett,* a state public campaign financing scheme violates the right to free political speech where it goes beyond mere promotion of the voluntary use of public funding, and

improperly injects the state into the political process by attempting to equalize the relative financial resources of candidates. As the United States Supreme Court held in striking down Arizona's matching funds scheme, the "constitutionally problematic" aspect of such a scheme is the manner in which that funding is provided—that it is triggered to deliver funds to publicly financed candidates in direct response to the political speech of privately financed opponents and independent expenditure groups. *Bennett*, 131 S.Ct. at 2824.

43. Plaintiff faces imminent injury to their First Amendment rights to free political speech and free association as a direct result of this statutory scheme. The state's payment of matching funds neutralizes the campaign contributor's or independent expender's attempt to exercise its voice through making an independent expenditure or contribution. The knowledge that making a contribution or an independent expenditure that opposes a government-funded candidate will directly result in that candidate receiving a dollar-for-dollar matching public subsidy creates a chilling effect on Plainitiff's free exercise of protected speech, and imposes a climate of self-censorship that is inimical to our American heritage of unfettered political discourse. In so doing, the statute also encroaches upon the ability of like-minded persons to pool their resources in furtherance of common political goals in violation of Plaintiff's right to freedom of association. As the Supreme Court stated in *Bennett,* the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office; thus, the Court will invalidate both limits on uncoordinated political

party expenditures and regulations barring unions, nonprofits, and corporations from making independent expenditures for electioneering communication. 131 S.Ct. at 2817; s*ee also Day v. Holahan*, 34 F.3d 1356, 1360 (8th Cir. 1994).

44.     The Act's "beggar thy neighbor" approach to free speech--burdening the speech of privately financed candidates and independent expenditure groups to increase the speech of others—is a concept "wholly foreign to the First Amendment." *Bennett*, 131 S.Ct. at 282. The burden is inherent in the choice that confronts contributors to privately financed candidates and independent expenditure groups. *Bennett* recognized that "a candidate or independent group might not spend money if the direct result of that spending is additional funding to political adversaries." *Bennett,* 131 S.Ct. at 2823.

45.     Because the Act's matching funds scheme imposes a substantial burden on the speech of privately funded candidates and independent expenditure groups, the provision cannot stand unless it is justified by a compelling state interest.   *Bennett,* 131 S.Ct. at 2824.

46.     The Act states that the matching funds scheme was created to prohibit the detrimental effects of increasingly large amounts of money being raised and spent to influence the outcome of elections because those effects are supposedly especially problematic in judicial elections because "impartiality is uniquely important to the integrity and credibility of the courts."   W.Va. Code § 3-12-2(8). The Act is also based on a finding that "as spending by candidates and independent

parties increases, so does the perception that contributors and interested third parties hold too much influence over the judicial process." *Id.* at § 3-12-2(7).

47.     As the North Carolina District Court noted in striking down that state's judicial public financing statute, similar interests were rejected in *Bennett. Leake, supra,* at 12-13.   As the West Virginia Attorney General persuasively noted, the Act's statutory findings and declarations are not materially different from the findings rejected in *Bennett.* A.G. Opinion at 5.

48.     The Supreme Court held that "independent expenditures . . . do not give rise to corruption or the appearance of corruption." *Citizens United v. FEC,* 130 S.Ct. 876, 909 (2010). By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. *Bennett*, 131 S.Ct. at 2826 (*quoting Citizens United,* 130 S.Ct. at 909). The separation between candidates and independent expenditure groups renders it impossible that independent expenditures will result in any *quid pro quo* corruption. *Id* at 2826-27.

49.     Finally, the Act cannot be justified by an interest in ensuring that campaign funding is equal across candidates.  The Supreme Court has repeatedly rejected the argument that the government has a compelling state interest in "leveling the playing field" that can justify undue burdens on political speech, *see, e.g., Citizens United,* 130 S.Ct. at 904, and the burdens imposed by matching funds cannot be justified by the pursuit of such an interest. In *Bennett,* the Supreme Court held that discriminatory contribution limits meant to "level electoral opportunities for candidates of different personal wealth" did not serve a legitimate

government interest, let alone a compelling one. *Bennett,* 131 S.Ct. at 2825. After all, "[l]eveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election." *Id.* The First Amendment embodies our choice as a nation that, when it comes to speech, the "guiding principle is freedom . . . not what the State may view as fair." *Bennett,* 131 S.Ct. at 2826 (internal citation omitted).

50.    Therefore, the State's chosen method is unduly burdensome and not sufficiently justified to survive First Amendment scrutiny. *Bennett*, 131 S.Ct. at 2828.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court to:

(1)    Declare W.Va. Code § 3-12-11 unconstitutional;

(2)    Declare W.V.C.S.R. § 146-5-8.8 unconstitutional;

(3)    Enjoin Defendants, their agents, and successors, from acting pursuant to these provisions and any related provisions implementing them;

(4)    Grant Plaintiff all costs and fees available under 42 U.S.C. § 1988 and any other applicable authority; and

(5)    Grant him such other relief as may be just and equitable.

**MICHAEL CALLAGHAN**
**By Counsel,**

16

/s/ Anthony J. Majestro
Anthony J. Majestro (WVSB 5165)
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P1200
Charleston, WV  25301
Phone:  304-346-2889
Fax:      304-346-2895
amajestro@powellmajestro.com

/s/ Paul T. Farrell
Paul T. Farrell (WVSB 7443)
GREENE, KETCHUM, BAILEY,
WALKER, FARRELL & TWEEL
419 Eleventh Street
PO Box 2389
Huntington, WV  25724-2389
Phone:  304-525-9115
Fax:      304-529-3284
paul@greeneketchum.com