## IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

STATE OF WEST VIRGINIA, ex rel,
ALLEN H. LOUGHRY, II, candidate for the
Supreme Court of Appeals of West Virginia



Petitioner,

vs.)                                                                No.  12-0899

NATALIE E. TENNANT, in her official capacity as
West Virginia Secretary of State;
NATALIE E. TENNANT, GARY A. COLLIAS,
WILLIAM N. RENZELLI, and ROBERT RUPP in
their official capacities as members of the West Virginia
State Election Commission; GLENN B. GAINER, III,
in his official capacity as the West Virginia State Auditor;
and JOHN PERDUE, in his official capacity as the
West Virginia State Treasurer,

Respondents.

----------------------------------------------------------------------------------------

### INTERVENOR MICHAEL CALLAGHAN'S  RESPONSE
### TO PETITION FOR WRIT OF MANDAMUS

----------------------------------------------------------------------------------------

Anthony J. Majestro (WVSB 5165)
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P1200
Charleston, WV  25301
Phone:  304-346-2889
Fax:    304-346-2895
amajestro@powellmajestro.com
*Counsel for Intervenor Michael Callaghan*

August 10, 2012

**Exhibit A**

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS...................................................................... i

TABLE OF AUTHORITIES ................................................................ ii

QUESTIONS PRESENTED................................................................. 1

STATEMENT OF THE CASE ............................................................. 2

SUMMARY OF ARGUMENT ............................................................. 8

STATEMENT REGARDING ORAL ARGUMENT AND DECISION .................... 13

ARGUMENT.................................................................................. 13

I.    Loughry is not Entitled to a Writ of Mandamus unless he can
      Establish that the Act's Provisions for Additional Taxpayer Funds are
      Constitutional because Respondents have no Duty to Implement an
      Unconstitutional Statutory Provision............................................ 13

II.   The Additional Funds Provisions in the Act are a Substantial Burden on the
      Right to Free Speech Protected by the First Amendment and are therefore
      Subject to Review under the Strict Scrutiny Test. ........................... 18

III.  The Act's Additional Funds Provisions do not Serve a Compelling State
      Interest and are not Narrowly Tailored to the Purported State Interest ... 21

CONCLUSION ............................................................................... 31

VERIFICATION ............................................................................. 33

CERTIFICATE OF SERVICE............................................................... 34

i

## TABLE OF AUTHORITIES

**PAGE**

Cases

*American Tradition Partnership, Inc. v. Bullock*, 132 S.Ct. 2490
(per curium) (2012) ................................................................. 12,26,27,29,30

*Arizona Free Enterprise Club's Freedom Club PAC v.
Bennett*, 131 S. Ct. 2806 (2011) ................................... 5,9,10,12,18-23,25,29-31

*Bauer v. Shepard*, 620 F.3d 704 (7th Cir.2010)........................................ 28

*Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009) ........ 10,11,12,24-29

*Citizens United v. F.E.C.*, 130 S.Ct. 876 (2010) ................. 9,11,12,20,22,26,27,29

*Davis v. Federal Election Com'n*, 554 U.S. 724 (2008) ................. 9,12,19,22,30

*NCRL PAC v. Leake*, No. 11-CV-472-FL [Doc. 41] (E.D.NC. 2012) .............. 31

*North Carolina Right to Life Committee Fund for Independent Political
Expenditures  v. Leake*, 524 F.3d 427 (4th Cir. 2008) ............................. 5,30

*Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997)............... 21,26

*Republican Party of Minnesota v. White*, 536 U.S. 765, 784 (2002) ..... 10,12,23,28

*Rogers v. Hechler*, 176 W.Va. 713, 348 S.E.2d 299 (1986)............................ 17,18

*State ex rel. Alsop v. McCartney,* 159 W.Va. 829,
228 S.E.2d 278 (1976) .............................................................. 18

*State ex rel. Boley v. Tennant*, 724 S.E.2d 783 (W.Va. 2012)........................ 14

*State ex rel. Cooper v. Tennant*, __ S.E.2d ___, ___. W.Va. ___,
2012 WL 517520 (2012) ........................................................... 13

*State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479,
153 S.E.2d 284 (W.Va. 1967) .................................................... 8,15

*State ex rel. Marockie v. Wagoner*, 190 W.Va. 467,  438 S.E.2d 810
(1993).............................................................................. 15

*State ex rel. Marockie v. Wagoner*, 191 W.Va. 458,
    446 S.E.2d 680 (1994) ................................................................ 15

*State ex rel. West Virginia Citizen Action Group v. Tomblin*,
    227 W.Va. 687, 715 S.E.2d 36 (2011) ...................................... 14,15

*State v. Conley*, 190 S.E. 908 (W.Va. 1937) ................................ 16

*U.S. v. Alvarez*, 132 S.Ct. 2537 (2012) ....................................... 20,26

*Western Tradition Partnership, Inc. v. Attorney General of State*, 363 Mont.
    220, 271 P.3d 1 (2011) ............................................................. 12,27

**Constitution, Statutes and Rules**

U.S. Const., art. VI, cl. 2 ............................................................ 14,29

U.S. Const., art. VI, cl. 3 ............................................................ 8,15

W.Va. Const., art. 1, sec. 1 ....................................................... 14

W.Va. Const., art. 4, sec. 5 ....................................................... 8,15

42 U.S. § 1983 ............................................................................ 16

N.C. G.S. §§ 163-278.62 through 163-278.70 ............................. 4

W.Va. Code § 3-12-1 .................................................................. 2

W.Va. Code § 3-12-11(a)(2) ........................................................ 2

W.Va. Code § 3-12-11(b)(1) ........................................................ 3

W.Va. Code § 3-12-11(e) ............................................................. 3,17

W.Va. Code § 3-12-11(f) .............................................................. 3,17

W.Va. Code § 3-12-11(g) ............................................................. 3

W.Va. Code § 3-12-11(i) .............................................................. 4

W.Va. Code § 3-12-17 ................................................................................ 2

W.Va. C.S.R. § 146-5-8.8(d) ...................................................................... 4,19

W.Va. C.S.R. § 146-5-12.2 ......................................................................... 4,6

W.Va. C.S.R. § 146-5-13 ............................................................................ 4

## QUESTIONS PRESENTED

1.   Whether public officials have a legal duty to implement a statutory provision when a similar provision has been declared unconstitutional by the United States Supreme Court and the West Virginia Attorney General has opined that the West Virginia provision is unconstitutional.

2.   Whether the provisions in the West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program allowing a candidate participating in the program to receive additional taxpayer funds based on the campaign spending of opponents or third parties imposes a substantial burden on the right to free speech protected by the First Amendment and are therefore subject to review under the strict scrutiny test.

3.   Whether the additional funds provisions of the West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program serve any compelling state interest and are narrowly tailored to any state interest.

1

## STATEMENT OF THE CASE

The West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program ("the Act") was established in 2010 as a pilot program for the 2012 primary election and the 2012 general election for the office of Justice of the Supreme Court of Appeals.  W.Va. Code § 3-12-1.  In 2012, the voters will elect two of the five Justices to twelve-year terms.  The Act sunsets following this election.  W.Va. Code § 3-12-17.

Eight candidates sought nomination in the May 8, 2012, West Virginia primary. Only one candidate, Allan Loughry, qualified to participate in the pilot project. App. at 24-25.

In the primary, Loughry and John Yoder received the Republican Party nominations in an uncontested primary.  Current Justice Robin Jean Davis and candidate Letitia "Tish" Chafin received the Democratic Party's nominations after receiving the two highest vote totals of the six candidates seeking the nomination.

Loughry raised $36,395 in order to qualify for the taxpayer subsidies provided by the pilot project.  App. at 24.  The West Virginia State Election Commission ("Commission") thereupon certified Loughry to receive taxpayer funding.  App. at 25.  As a certified candidate in an uncontested primary, Loughry received $13,705 from the public fund to give him $50,000.00 to spend on an uncontested primary. App. at 25; *see* W.Va. Code § 3-12-11(a)(2).

2

Once Loughry was certified as the Republican nominee, the Commission authorized the distribution of $350,000.00 in public funds to Loughry, the amount available to a participating candidate in a contested election. App. at 27; *see also* W.Va. Code § 3-12-11(b)(1).

The Act contains several provisions that purport to provide matching funds to certified candidates participating in the pilot project:

(e) If the commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that a nonparticipating candidate's campaign expenditures or obligations, in the aggregate, have exceeded by twenty percent the initial funding available under this section any certified candidate running for the same office, the commission shall authorize the release of additional funds in the amount of the reported excess to any opposing certified candidate for the same office.

(f) If the State Election Commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that independent expenditures on behalf of a nonparticipating candidate, either alone or in combination with the nonparticipating candidate's campaign expenditures or obligations, have exceeded by twenty percent the initial funding available under this section to any certified candidate running for the same office, the commission shall authorize the release of additional funds in the amount of the reported excess to any certified candidate who is an opponent for the same office.

(g) If the commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that independent expenditures on behalf of a certified candidate, in combination with the certified candidate's campaign expenditures or obligations, exceed by twenty percent the initial funding available under this section to any certified candidate running for the same office, the State Election Commission shall authorize the release of additional funds in the amount of the reported excess to any other certified candidate who is an opponent for the same office.

W.Va. Code § 3-12-11.

3

Under these additional funds provisions in the Act, a participating candidate in a contested general election can receive up to $700,000.00 in additional public funds triggered by expenditures by nonparticipating candidates or independent expenditures by third parties.   W.Va. Code § 3-12-11(h).   Once it has been determined by the Commission that the matching funds provisions have been triggered, the Act requires that the funds be issued to the participating candidate within two business days.   W.Va. Code § 3-12-11(i).

While the Act is not clear on the question, the regulations enacted implementing the Act make it clear that an expenditure of one dollar in excess of the 20% threshold results in the participating candidate receiving contributions matching the nonparticipating candidate's expenditures in excess of $350,000.00 up to an additional $700,000.00 in public funds.   W.V.C.S.R. § 146-5-8.8(d).

The regulations contain reporting requirements for nonparticipating candidates and persons conducting independent expenditures in the 2012 Supreme Court general election.   W.V.C.S.R. § 146-5-12.2 (nonparticipating candidates); *id.* at § 146-5-13 (independent expenditures).   Under these regulations, nonparticipating candidates were required to report to the Secretary of State by July 7, 2012, "a listing of expenditures and obligations incurred since May 9, 2012 through July 1, 2012, if those expenditures and obligations, in the aggregate, exceed $350,000." *Id.* at § 12.2.a.

The West Virginia Act was based on Article 22D of North Carolina's "Elections and Election Laws," G.S. §§ 163-278.62 through 163-278.70, which became effective

4

in 2002. Litigation challenging the constitutionality of the North Carolina law commenced in 2006. Ultimately, the United States Court of Appeals for the Fourth Circuit upheld the constitutionality of the North Carolina statute. *North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake*, 524 F.3d 427 (4th Cir. 2008). The Supreme Court of the United States denied certiorari. 555 U.S. 994 (2008).

The West Virginia Act was enacted in 2010. A year after its enactment, the Supreme Court of the United States decided *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011). In *Bennett*, the Court applied strict scrutiny and struck down Arizona's matching funds provision which applied only to legislative and executive races. Notably, in striking down the Arizona statute, the Supreme Court in *Bennett* specifically characterized the North Carolina act as having "matching funds statutes that resemble Arizona's law." *Id.* at 2816 n.3.

Following the decision in *Bennett,* the Commission sought an opinion of the West Virginia Attorney General regarding the constitutionality of the matching funds provision of the West Virginia Act. App. at 21. The Attorney General responded on July 28, 2011, concluding that the Act's matching funds provision could not survive the strict scrutiny analysis mandated by *Bennett.* Pet. App. at 169-70.

Following the receipt of the Attorney General's opinion, the Secretary of State publicly announced that she intended to follow the Attorney General's opinion and

5

not implement the matching funds provisions of the Act. *See* http://www.wvrecord.com/news/245447-former-w.va.-democratic-party-chairman-challenges-candidate-financing-program. The Commission was informed of this decision. App. at 23.

Loughry made the decision to participate in the pilot project after the *Bennett* was decided and after the SEC Respondents indicated they would not implement the additional funds provisions of the Act. App. at 24; Pet. App. at 158.

On June 21, 2012, Loughry appeared at a regularly scheduled meeting of the Commission and requested that the Commission take a position on whether it would fully implement the matching funds provision. App. at 27-28. The Commission refused to take a position. App. at 28.

On June 22, 2012, the disclosure provision set forth in W.V.C.S.R. 146-5-12.2 was implemented through the promulgation of a reporting form. The nonparticipating candidates were notified by e-mail of the new form and the requirement that it be filed by July 6, 2012. While § 12.2 of the regulations contemplates disclosure once expenditures exceed $350,000.00, the form provided to the candidates by the Secretary's election division required disclosure only when candidates expended or committed $420,000.00, the trigger for the additional payments. On July 6, 2012, Justice Davis, a nonparticipating candidate, filed the form provided to the nonparticipating candidates. Her filing showed expenditures of $494,471.00. *See* Pet. App. at 161.

6

On July 17, 2012, an emergency meeting of the Commission was held in Charleston, West Virginia. App. at 30-31. The Commission voted to acknowledge that Justice Davis had expended sufficient sums to trigger the matching funds provisions under the Act. *Id.* The Commission then proceeded to vote on a motion to authorize the release of matching funds to Loughry. *Id.* The motion failed on a tie vote of the four members. The debate against the motions centered on the constitutionality of the matching provisions. App. at 31.

On July 18, 2012, Michael Callaghan filed a lawsuit in the United States District Court for the Southern District of West Virginia challenging the constitutionality of the additional funds provisions of the Act. App. 1. Callaghan makes contributions to candidates for elected office in West Virginia and wishes to make contributions to the two non-participating candidates nominated by the Democratic Party for the 2012 election to the Supreme Court of Appeals of West Virginia. App. at 4. Because the contributions would trigger matching funds to one of the opposing candidates, Callaghan will not do so. *Id.* He also opposes the use of taxpayer money to finance elections. *Id.* Callaghan, together and in combination with others, wishes to conduct independent expenditures in favor of candidates who oppose public financing and/or in opposition to candidates who accept public funds to support their campaigns. *Id.*

On July 30, 2012, Loughry filed the instant Petition joining as respondents the Secretary of State, the members of the Commission, the State Auditor, and the State Treasurer. The Auditor and Treasurer have filed responses that do not take a

7

position on the constitutionality of the Act. The Secretary of State and the Commission (collectively "the SEC Respondents") have filed a response supporting the constitutionality of the Act. On August 9, 2012, Callaghan filed a motion to intervene in these proceedings and now files this Response.

## SUMMARY OF ARGUMENT

A writ of mandamus is an extraordinary form of relief designed to remedy miscarriages of justice. Mandamus is appropriate only if the Petitioner can establish: (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Under both the United States Constitution and the West Virginia Constitution, state statutes are subservient to constitutional dictates. Respondents are required to take oaths of office by both the United States and West Virginia constitutions to support the United States Constitutions. U.S. Const., art. VI, cl. 3; W.Va. Const., art. 4, sec. 5.

Because of this constitutional supremacy, this Court has long recognized that state officials need not follow unconstitutional statutes and a mandamus petitioner fails to show a clear legal right to the remedy when he seeks enforcement of a statute that is unconstitutional. *State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479, 494, 153 S.E.2d 284, 292 (W.Va. 1967).

Respondents, who have taken an oath to support the United States Constitution, are bound to avoid acts that violate the United States Constitution. They correctly

8

refrained from implementing statutory provisions the Supreme Court of the United States has declared unconstitutional. Because of this duty Petitioner must establish the constitutionality of each of the disputed provisions of the Act without regard to whether anyone objects.

The additional funds provisions in the Act violate the First Amendment's protections from laws "abridging the freedom of speech." U.S. Const., Amend. 1. In *Bennett*, the Court emphasized that these protections hold special importance in the context of a campaign. *Bennett*, 131 S.Ct. at 2817. The *Bennett* Court concluded that the provision of additional funds to a publicly financed candidate based on the spending of privately financed candidates and/or third parties "imposes an unprecedented penalty on any candidate who robustly exercises [his] First Amendment right[s]." 131 S.Ct. at 2812 (quoting *Davis v. Federal Election Com'n*, 554 U.S. 724, 739 (2008)). The *Bennett* Court also concluded that the burden on third-party expenditures was even greater than the burden imposed on privately financed candidates. 131 S.Ct. at 2819. Because the additional funds provision "imposes a substantial burden on the speech of privately financed candidates and independent expenditure groups" strict scrutiny applies. *Bennett*, 131 S.Ct. at 2824. This means that the Petitioner must prove that the additional funds provision furthers a compelling interest and is narrowly tailored to achieve that interest. *Citizens United v. F.E.C.*, 130 S.Ct. 876, 898 (2010). Moreover, when the Government seeks to regulate protected speech, the restriction must be the least restrictive means among available, effective alternatives.

*Bennett* rejected the claim that providing a publicly financed candidate with additional funds to match the spending of privately financed candidates and independent persons or groups served any compelling state interest. 131 S.Ct. at 2826-27. *Bennett* rejected the idea that the additional funds provisions served a compelling interest in combating corruption and the appearance of corruption. *Id.* The Court found that with respect to candidate expenditures, reliance on personal funds *reduces* the threat of corruption because the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse of money in politics. *Id.* With respect to independent expenditures, the Court reaffirmed that independent expenditures do not give rise to corruption or the appearance of corruption. *Bennett,* 131 S.Ct. at 2826-27.

The United States Supreme Court has consistently rejected any distinguishing of its speech protections in the context of judicial elections. *Republican Party of Minnesota v. White*, 536 U.S. 765, 784 (2002) (rejecting claim that the rationale underlying unconstrained speech in elections for political office does not carry over to campaigns for the bench).

Nothing in *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009), supports the claim for a less robust right to speech in the context of a judicial election. *Caperton* did not hold that avoiding the appearance of impropriety was a requirement of due process. Due process required recusal in *Caperton* not because of appearances; instead, due process required recusal because the extraordinary and

10

unprecedented expenditures in that case created "a serious, objective risk of *actual bias.*" 556 U.S. at 886 (emphasis added).

The Act in question cannot be justified as preventing the contributions at issue in *Caperton.* The Act's match of funds is capped at $700,000.00. W.Va. Code § 3-12-11(h). There are no findings or evidence to support the conclusion that providing limited matching funds will dissuade large independent expenditures like the one in *Caperton.* In addition here, the majority of the large expenditures have been candidate self financing. The Petitioner's reasoning based on *Caperton* does not apply to self-funded candidates as they cannot be perceived as beholden to their contributors. Finally, the recusal rule of *Caperton* will deter large expenditures by litigants and provide a remedy by removing any judge that is the beneficiary of another *Caperton* sized expenditure. As stricter recusal rules can also serve as an available, effective alternative that does not trample on protected speech, the purported interest in avoiding appearances of conflict fails strict scrutiny review.

*Citizens United,* the Court expressly rejected *Caperton's* application to campaign finance restrictions holding that "*Caperton 's* holding was limited to the rule that the judge must be recused, not that the litigant's political speech could be banned." *Citizens United,* 130 S.Ct. at 910. Thus, *Citizens United* made it clear that the due process concerns in *Caperton* were not compelling interests that withstood a first amendment challenge when the strict scrutiny standard governed.

In *American Tradition Partnership, Inc. v. Bullock,* 132 S.Ct. 2490 (per curium) (2012), the Supreme Court of the United States summarily rejected the same

11

arguments raised by Loughry here.  At issue in *Bullock*, was Montana's ban on corporate campaign expenditures.  The Montana Supreme Court recognized that the Court in *Citizens United* applied strict scrutiny and invalidated a ban on electioneering communications in federal elections. *Western Tradition Partnership, Inc. v. Attorney General of State*, 363 Mont. 220, 226-228, 271 P.3d 1, 5-6 (2011). The Montana Court, however, attempted to distinguish *Citizens United* in part by relying on the *Caperton* and the fact that Montana elected its judiciary to support its holding that Montana had a compelling state interest sufficient to support the burdens on speech in the Montana laws.  363 Mont. at 236-239, 271 P.3d at 11-13. Those arguments, however, were rejected in the Supreme Court of the United States which summarily reversed the Montana court in its entirety holding that "Montana's arguments in support of the judgment below either were already rejected in *Citizens United*, or fail to meaningfully distinguish that case. *Bullock*, 132 S.Ct. at 2491 (emphasis added).

In sum, five opinions of the Supreme Court of the United States -- *White, supra, Davis, supra, Bennett, supra, Citizens United, supra,* and *Bullock, supra* – all compel the conclusion that the additional funds provisions in the Act unconstitutionally burden speech notwithstanding the fact that the burdens are imposed in the context of a judicial election.

12

## STATEMENT REGARDING ORAL ARGUMENT AND DECISION

Intervenor Callaghan believes that the dispositive issues raised by this case have been authoritatively decided by the United States Supreme Court and this Court and that the facts and legal arguments have been adequately presented in the briefs.   Consequently, oral argument is not necessary.  Rev. Rule of App. Pro. 18(a).  While Intervenor does not believe oral argument is necessary, his counsel will make himself available for a Rule 19 or Rule 20 argument should the Court desire to hear oral argument.  Should the Court schedule argument, Intervenor requests that the Court divide argument among the parties commensurate with the positions taken in the litigation rather than equally split argument between the Petitioner and the Respondents.  Intervenor Callaghan believes that a published opinion would be appropriate.

## ARGUMENT

I.   **Loughry is not Entitled to a Writ of Mandamus unless he can Establish that the Act's Provisions for Additional Taxpayer Funds are Constitutional because Respondents have no Duty to Implement an Unconstitutional Statutory Provision.**

In his Petition, Loughry seeks a writ of mandamus, an "extraordinary form[] of relief . . . designed to remedy miscarriages of justice." *State ex rel. Cooper v. Tennant,* __ S.E.2d ___, ___. W.Va. ___, 2012 WL 517520, p*5-6 (2012).  This Court's decisions have cautioned that the remedy has "consistently been used sparingly and under limited circumstances." *Id.*  Entitlement to the extraordinary remedy of

13

mandamus places the burden on the petitioner to establish that three fundamental elements coexist:

> (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syl. pt. 1, *State ex rel. Boley v. Tennant*, 724 S.E.2d 783 (W.Va. 2012); *see also State ex rel. West Virginia Citizen Action Group v. Tomblin*, 227 W.Va. 687, 692, 715 S.E.2d 36, 41 (2011) (same). In the context of an election mandamus case, this Court has focused on the first and second elements. *See, e.g., Boley,* 724 S.E.2d at 787.

In the Petition Loughry contends that he has a clear legal right to the release of up to $700,000.00 in additional taxpayer funding for his campaign and that the Respondents have a clear legal duty to release the funds. Petition at 12-14. His arguments focus solely on the statutory language in the Act. *Id.*

Of course, both the United States Constitution and the West Virginia Constitution contain Supremacy Clauses explicitly making state statutes subservient to constitutional dictates. U.S. Const., art. VI, cl. 2 ("[U.S.] Constitution . . . shall be the Supreme Law of the Land..."); W.Va. Const., art. 1, sec. 1 ("The constitution of the United States of America. . . shall be the supreme law of the land."). The Supremacy Clause of the United States Constitution also binds "the Judges in every State [to federal constitutional supremacy]. . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Loughry's suggestion, Petition at 14, that Respondents

14

are free to "assert [their] own vision or state interest" and implement a statutory provision condemned by the United States Supreme Court is explicitly contrary to the oath of office required by both the United States and West Virginia constitutions. U.S. Const., art. VI, cl. 3 ("all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution"); W.Va. Const., art. 4, sec. 5 ("Every person elected or appointed to any office. . . shall make oath or affirmation that he will support the constitution of the United States and the constitution of this state").

Because of this constitutional supremacy, this Court has long recognized that state officials need not follow unconstitutional statutes:

> Mandamus lies to require the discharge by a public officer of a nondiscretionary duty. . . ; and if the statute upon which the petitioner in mandamus relies for the relief which it seeks were valid the petitioner would be entitled to the relief which it seeks in that proceeding. But inasmuch as that statute is unconstitutional, null and void as violative of the applicable [constitutional] provision . . ., the petitioner has failed to show a clear legal right to the remedy which it seeks. For that reason the writ must be and it is denied and the proceeding in mandamus is dismissed.

*State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479, 494, 153 S.E.2d 284, 292 (W.Va. 1967); *compare State ex rel. Marockie v. Wagoner*, 190 W.Va. 467, 474, 438 S.E.2d 810, 817 (1993) ("Because we conclude that the SBA bonds at issue in this case violate Section 4 of Article X of our Constitution, we decline to issue the writ of mandamus.") *with State ex rel. Marockie v. Wagoner*, 191 W.Va. 458, 469-70, 446 S.E.2d 680, 691-92 (1994) (granting writ of mandamus after determining amended statute constitutional); *cf. State ex rel. West Virginia*

*Citizen Action Group v. Tomblin,* 227 W.Va. at 697, 715 S.E.2d at 45-46 (granting writ of mandamus forcing Acting Governor to call special gubernatorial election when statute allowing him to serve as Acting Governor through end of unexpired term was unconstitutional).

As set forth below, the provisions for additional funds and the regulations implementing them are unconstitutional. As such, Respondents have a duty under both the United States Constitution and West Virginia Constitution to refrain from implementing a provision that violates the First Amendment to the United States Constitution. Indeed, public officials who violate a clearly established rights such as the First Amendment rights at issue here expose themselves to civil liability under the Civil Rights Act.[1] *See* 42 U.S.C. § 1983.

Similarly, because Respondents, who have taken an oath to support the United States Constitution, are bound to avoid acts that violate the United States

---

[1]Loughry's citation to *State v. Conley,* 190 S.E. 908, 918-19 (W.Va. 1937) is curious. In *Conley,* school board members were *held personally liable* for investment losses which occurred after the board members improperly invested school board funds in investment vehicles prohibited by the West Virginia Constitution. The *Conley* Court concluding that an Attorney General opinion "on the power of the board of the school fund to invest the school fund, *while entitled to weight,* does not relieve the members of the board from personal liability for losses to the fund, resulting from investments which they were not legally authorized to make." *Id.* at syl. pt. 4 (emphasis added). If a public official is personally liable for expending public funds in violation of the Constitution when the Attorney General has approved of the expenditure in a formal opinion, Intervenor is at a loss to understand why public officials should be required to expose themselves to possible financial loss and authorize an expenditure that the Attorney General has expressly opined is unconstitutional based on an opinion of the United States Supreme Court.

16

Constitution, they have an independent duty to act in conformance with United States Constitution. Respondents correctly refrained from implementing statutory provisions the Supreme Court of the United States has declared unconstitutional in spite of the fact that no one challenged the their constitutionality. *Cf.* Petition at 19-20. Because Respondents have a duty not to take actions in violation of the United States Constitution, Petitioner must establish the constitutionality of each of the disputed provisions of the Act without regard to whether anyone objects.

Finally, Intervenor Callaghan has "standing" to challenge all of the unconstitutional provisions of the Act. First, Callaghan seeks to both conduct independent expenditures and contribute to the two non-participating candidates. App. at 4, ¶¶ 8-9. As a potential contributor to a non-participating candidate, he has standing to challenge the non-participating candidate expenditure trigger set forth in W.Va. Code § 3-12-11(e) so that his First Amendment rights are not burdened by his contributions triggering taxpayer contributions to Loughery. Second, because Justice Davis has already exceeded the additional funds trigger, any independent expenditure by Callaghan in support of Justice Davis or in opposition to Loughry will trigger additional funds to Loughery and further burden Callaghan's speech. W.Va. Code § 3-12-11(f).

More importantly, however, with respect to election laws relating to campaign expenditures, this Court has found that any citizen, taxpayer, or voter has standing in an election mandamus case because the rights involved are public rights. *Rogers v. Hechler,* 176 W.Va. 713, 716, 348 S.E.2d 299, 302-03 (1986) (citing numerous

17

cases).  In doing so this Court noted that it has "consistently recognized the 'special public concern with insuring the regularity of elections' and that 'citizens, taxpayers and voters have sufficient interest in such matters to bring actions in mandamus to compel election officials to discharge their duties in a lawful and proper manner.'" *Id.* (citing *State ex rel. Alsop v. McCartney,* 159 W.Va. 829, 838 n. 7, 228 S.E.2d 278, 283 n. 7 (1976)).

## II.  The Additional Funds Provisions in the Act are a Substantial Burden on the Right to Free Speech Protected by the First Amendment and are therefore Subject to Review under the Strict Scrutiny Test.

The First Amendment protects citizens from laws "abridging the freedom of speech."  U.S. Const., Amend. 1.  In *Bennett,* the Court emphasized the special importance that these protections hold in the context of a campaign:

> "Discussion of public issues and debate on the qualifications of candidates are integral to the operation" of our system of government. *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*per curiam*). As a result, the First Amendment " 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (quoting *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)).

*Bennett,* 131 S.Ct. at 2817 (emphasis added).

In *Bennett,* the Court considered the constitutionality of Arizona's public finance statute which, like the Act here, provided an initial award of public funds to a participating candidate and additional sums to the publicly funded candidate if the privately financed candidate or a third-party expended funds in excess of the initial grant.  131 S.Ct. at 2815-16.  The Supreme Court concluded that the provision

"imposes an unprecedented penalty on any candidate who robustly exercises [his] First Amendment right[s]." 131 S.Ct. at 2812 (quoting *Davis,* 554 U.S. at 739). With respect to independent expenditure groups, the *Bennett* Court concluded that the burden was even greater than the burden imposed on privately financed candidates because, while candidates have the choice of accepting public funds if they decides that the burdens imposed by the matching funds regime make a privately funded campaign unattractive, individuals or organizations desiring to support or oppose a candidate do not. 131 S.Ct. at 2819.

The Court explained that the additional funds provisions burden speech in several ways. First, the threat of additional funds chills candidates from speaking by threatening speech with the "direct an automatic release of public money." *Id.* The Act here causes even a greater chill due to the implementation of the trigger. A nonparticipating candidate can spend up to $420,000.00 before triggering additional funds; however, if one dollar more is spent by the non-participating candidate, the participating candidate receives taxpayer funds matching the nonparticipating candidate's entire expenditures in excess of $350,000.00. W.V.C.S.R. § 146-5-8.8(d). Thus, one dollar expenditure could be matched seventy times with public funds. *Bennett* characterized a much smaller multiplier effect as a "significant burden." 131 S.Ct. at 2819.

The *Bennett* Court found a final burden due to the disparity of control inherent in the additional funds provision:

19

Even if that candidate opted to spend less than the initial public financing cap, any spending by independent expenditure groups to promote the privately financed candidate's election—regardless whether such support was welcome or helpful—could trigger matching funds. What is more, that state money would go directly to the publicly funded candidate to use as he saw fit. That disparity in control—giving money directly to a publicly financed candidate, in response to independent expenditures that cannot be coordinated with the privately funded candidate—is a substantial advantage for the publicly funded candidate. That candidate can allocate the money according to his own campaign strategy, which the privately financed candidate could not do with the independent group expenditures that triggered the matching funds.

131 S.Ct. at 2819.  This lack of control is even more pronounced in the Act here as the multiple seat race results in the participating candidate receiving taxpayer funds if one of the nonparticipating candidates opts to exceed the trigger even if the other two privately financed candidates do not.

Because the additional funds provision "imposes a substantial burden on the speech of privately financed candidates and independent expenditure groups" strict scrutiny applies. *Bennett*, 131 S.Ct. at 2824.  As the Supreme Court held in *Citizens United*:

[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.

130 S.Ct. at 898 (citations and internal quotations omitted).  In addition, when the Government seeks to regulate protected speech, the restriction must be the "least restrictive means among available, effective alternatives."  *U.S. v. Alvarez*, 132 S.Ct. 2537, 2551 (2012) (plurality opinion) (citation and internal quotations

omitted); *see also Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997) ("That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.").

The SEC Respondents seem to question the applicability of the strict scrutiny standard. As the above cases make clear, there is no doubt that the strict scrutiny standard is appropriate here.

### III. The Act's Additional Funds Provisions do not Serve a Compelling State Interest and are not Narrowly Tailored to the Purported State Interest.

*Bennett* rejected the claim that providing a publicly financed candidate with additional funds to match the spending of privately financed candidates and independent persons or groups served any compelling state interest. Loughry and the SEC Respondents attempt to distinguish this binding precedent by arguing that judicial elections, which were not at issue in *Bennett,* are different. These arguments ignore numerous opinions of the Supreme Court of the United States that establish that the additional funds provisions of the Act cannot meet the strict scrutiny test.

First, *Bennett* rejected the claim that the provision could be justified by a desire to "level the playing field" holding that "[l]eveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election — a dangerous enterprise and one that cannot justify burdening protected speech." 131 S.Ct. at 2826.

21

Second, *Bennett* rejected the idea that the additional funds provisions served a compelling interest in combating corruption and the appearance of corruption holding that "the burdens that the matching funds provision imposes on protected political speech are not justified." 131 S.Ct. at 2826. With respect to candidate expenditure, the Court focused on the burden on a candidate who funds his own campaign:

> Indeed, we have said that "reliance on personal funds *reduces* the threat of corruption" and that "discouraging [the] use of personal funds[ ] disserves the anticorruption interest." *Davis, supra,* at 740–741, 128 S.Ct. 2759. That is because "the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse" of money in politics. *Buckley, supra,* at 53, 96 S.Ct. 612. The matching funds provision counts a candidate's expenditures of his own money on his own campaign as contributions, and to that extent cannot be supported by any anticorruption interest.

131 S.Ct. at 2826. With respect to independent expenditures, the Court noted:

> We have also held that "independent expenditures ... do not give rise to corruption or the appearance of corruption." *Citizens United,* 558 U.S., at —— –, 130 S.Ct., at 909. "By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Id.,* at ——, 130 S.Ct., at 910. The candidate-funding circuit is broken. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned. See *id.,* at —— – —— —, 130 S.Ct., at 909–911; cf. *Buckley,* 424 U.S., at 46, 96 S.Ct. 612. Including independent expenditures in the matching funds provision cannot be supported by any anticorruption interest.

*Bennett,* 131 S.Ct. at 2826-27. Finally, the *Bennett* Court rejected the idea that the additional funds served the interest of encouraging participating in public financing. *Id.* at 2827.

22

Loughry's argument is that somehow judicial elections are different. The United States Supreme Court has consistently rejected this distinction. First, the *Bennett* Court characterized North Carolina's judicial public finance statute as one that "resemble[s]" the Arizona statute at issue in *Bennett.* 131 S.Ct. at 2816, n.3. The Court has also explicitly rejected any constitutional distinction:

> Justice GINSBURG greatly exaggerates the difference between judicial and legislative elections. She asserts that "the rationale underlying unconstrained speech in elections for political office-that representative government depends on the public's ability to choose agents who will act at its behest-does not carry over to campaigns for the bench." *Post,* at 2551. This complete separation of the judiciary from the enterprise of "representative government" might have some truth in those countries where judges neither make law themselves nor set aside the laws enacted by the legislature. It is not a true picture of the American system. Not only do state-court judges possess the power to "make" common law, but they have the immense power to shape the States' constitutions as well.

*White*, 536 U.S. at 784; *see also id.* at 792 (O'Connor, J., concurring) ("In [choosing to elect judges] the State has voluntarily taken on the risks to judicial bias described above. As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling."); *id.* at 795 (Kennedy, J., concurring) ("The State cannot opt for an elected judiciary and then assert that its democracy, in order to work as desired, compels the abridgment of speech."). The SEC Respondents' argument that robust debate is inconsistent with judicial elections, SEC Response at 8, is contrary to the *White* Court's recognition that a state that chooses to elect judges cannot justify the abridgment of the fundamental right to freedom of speech on the grounds that the elections are for judicial offices.

23

Loughry next argues that *Caperton* somehow changes these established, consistent holdings. Loughry both misreads *Caperton* and ignores subsequent decisions of the Supreme Court confirming that *Caperton* does not support a less robust right to speech.

First, *Caperton* did not hold that avoiding the appearance of impropriety was a requirement of due process. Instead, *Caperton* held that "Not every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal." 556 U.S. at 884. The Court found the contribution in *Caperton* was unprecedented. 556 U.S. at 887 ("The facts now before us are extreme by any measure. The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case."). Due process required recusal in *Caperton* not because of appearances; instead, due process required recusal because the expenditures in that case created "a serious, objective risk of *actual bias*." 556 U.S. at 886 (emphasis added).

The Act in question cannot be justified as preventing the contributions at issue in *Caperton*. First, the Act's match of funds is capped at $700,000.00. W.Va. Code § 3-12-11(h). The $3,000,000.00 expenditure in *Caperton* was made in spite of the fact that an opposing independent expenditure group spent approximately $2,000,000.00. *See   http://   forms.   irs.   gov/   political   Orgs   Search/ search/gotoSearchDrillDown.action?pacId='22659'          &          criteriaName=' West+Virginia+  Consumers+for+Justice'.* There are no findings or evidence to

24

support the conclusion that providing limited matching funds will dissuade large independent expenditures like the one in *Caperton*.

Second, as applied to this election, the majority of the large expenditures have been candidate self financing.   *See* "Davis, Chafin win Democratic primary for Supreme        Court,"        *Charleston        Daily        Mail*        (May        8,        2012) (http://www.dailymail.com/News/201205080273). What was true with respect to the legislative races in *Bennett* is also true with the judicial races here.  Self-funding serves the very interest in an unbiased judiciary that Loughry claims supports the Act as self-funded candidates cannot be perceived as beholden to their contributors.[2]

*Caperton's* holding that extremely large expenditures by a candidate require recusal both creates the solution to the supposed perception problem and acts as a deterrent to spending by litigants.   Because *Caperton* requires recusal when extreme spending on a judicial election occurs, a litigant will be reluctant to engage in this type of spending.  Moreover, *Caperton's* required recusal creates the solution to the appearances problem Loughery advances.  If a Justice is the beneficiary of *Caperton* level expenditures, it is clear that recusal is now mandatory.  Finally,

---

[2]The SEC Respondents argue that expenditures of personal funds by judicial candidates suggest a personal agenda that "could very well cause a perception of bias antithetical to an impartial and independent judiciary – a judiciary not influenced by personal agendas."   SEC Response at 7-8.   This un-sourced speculation is hardly sufficient to withstand strict scrutiny.  Neither Petitioner nor Respondents point to any findings or evidence supporting *any* conclusion regarding self-financed candidates.   The SEC Respondents' suggestion that equalizing money results in a judiciary perceived to be elected on the merits, SEC Response at 8-9, suffers from the same deficit.

while it is true that the *Caperton* recusal motion will be a rare one, nothing prevents the State from adopting stricter recusal rules. "The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today." 556 U.S. at 889-90 (citation and internal quotation omitted). Because stricter recusal rules are an available, effective alternative that does not trample on protected speech,[3] the purported interest in avoiding appearances of conflict fails strict scrutiny review. *Alverez, supra; Reno, supra.*

If there was any doubt that *Caperton* did not change the rules to create less robust speech protections in judicial elections, two subsequent decisions settled the issue – *Citizens United* and *Bullock.*

First, in *Citizens United,* the Court expressly rejected *Caperton's* application to campaign finance restrictions:

> *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), is not to the contrary. *Caperton* held that a judge was required to recuse himself "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Id.,* at ——, 129 S.Ct., at 2263–2264. The remedy of recusal was based on a litigant's due process right to a fair trial before an unbiased judge. See *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). *Caperton 's holding was limited to the*

---

[3]*See, e.g.,* Adam Skaggs and Andrew Silver, Promoting Fair and Impartial Courts through Recusal Reform, *Brennan Center for Justice,* August, 2011 (http://brennan.3cdn.net/ 09c926c04c9eed5290_e4m6iv2v0.pdf).

> *rule that the judge must be recused, not that the litigant's political speech could be banned.*

*Citizens United*, 130 S.Ct. at 910. Thus, *Citizens United* made it clear that the due process concerns in *Caperton* were not compelling interests that withstood a first amendment challenge when the strict scrutiny standard governed.

More recently in *Bullock*, Supreme Court of the United States summarily rejected the same arguments raised by Loughry here. At issue in *Bullock*, was Montana's ban on corporate campaign expenditures. *See Western Tradition Partnership, Inc. v. Attorney General of State*, 363 Mont. 220, 271 P.3d 1 (2011). The Montana Supreme Court recognized that the Court in *Citizens United* applied strict scrutiny and invalidated a ban on electioneering communications in federal elections. 363 Mont. 220, 226-228, 271 P.3d 1, 5-6. The Montana Court, however, attempted to distinguish *Citizens United* in part by relying on *Caperton* and the fact that Montana elected its judiciary. To support its holding that Montana had a compelling state interest sufficient to support the burdens on speech in the Montana laws, the Montana Court noted:

> ¶ 39 Montana also has a compelling interest in protecting and preserving its system of elected judges. In this State, the people elect the Justices of the Supreme Court, the Judges of the District Courts, and most lower court judges as well. . . .
>
> The people of the State of Montana have a continuing and compelling interest in, and a constitutional right to, an independent, fair and impartial judiciary. The State has a concomitant interest in preserving the appearance of judicial propriety and independence so as to maintain the public's trust and confidence. In the present case, the free speech rights of the corporations are no more important than the due process rights of litigants in Montana

courts to a fair and independent judiciary, and both are constitutionally protected. . . .

¶ 43 The United States Supreme Court has affirmed the importance of judicial integrity and in maintaining public respect for the judiciary.

"Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. *Judicial integrity is, in consequence, a state interest of the highest order.*" [Emphasis added.]

*Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, ——, 129 S.Ct. 2252, 2266–67, 173 L.Ed.2d 1208 (2009) (quoting *Republican Party of Minn. v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002)). The Court also recognizes the importance of state codes of judicial conduct, which "serve to maintain the integrity of the judiciary and the rule of law." *Caperton,* 556 U.S. at ——, 129 S.Ct. at 2266. States have a "compelling interest" in preventing judges from activities that "would undermine actual impartiality, as well as its appearance." *Bauer v. Shepard,* 620 F.3d 704, 711 (7th Cir.2010) (upholding limits on judges acting in posts of political leadership and delivering political speeches). "The state certainly has a compelling state interest in the public's trust and confidence in the integrity of our judicial system." *Simes v. Ark. Judicial Discipline and Disability Comm.,* 368 Ark. 577, 247 S.W.3d 876, 882 (2007).

363 Mont. at 236-239, 271 P.3d at 11-13.  Notably, the holding of the Montana

Supreme Court made many of the same arguments relied on by Loughry and the

SEC Respondents.

Those arguments, however, were rejected in the Supreme Court of the United

States.  After staying the Montana decision to permit review, the Supreme Court

summarily reversed:

A Montana state law provides that a "corporation may not make ... an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party." Mont.Code Ann. § 13–35–227(1) (2011). The Montana Supreme Court rejected petitioners' claim

that this statute violates the First Amendment. 2011 MT 328, 363 Mont. 220, 271 P.3d 1. In *Citizens United v. Federal Election Commission,* this Court struck down a similar federal law, holding that "political speech does not lose First Amendment protection simply because its source is a corporation." 558 U.S. ——, ——, 130 S.Ct. 876, 900, 175 L.Ed.2d 753 (2010) (internal quotation marks omitted). The question presented in this case is whether the holding of *Citizens United* applies to the Montana state law. There can be no serious doubt that it does. See U.S. Const., Art. VI, cl. 2. *Montana's arguments in support of the judgment below either were already rejected in Citizens United, or fail to meaningfully distinguish that case.*

*Bullock,* 132 S.Ct. at 2491 (emphasis added).    A review of the briefs filed in the

United States Supreme Court makes it clear that the supposed compelling interest

in regulating speech in judicial races was directly presented to the United States

Supreme Court in *Bullock.*[4]    Thus, the *Bullock* Court rejected the reading of

*Caperton* advanced by Loughery and the SEC Defendants.    Any attempt to

distinguish *Bennett* here would be unlikely to fair any better.[5]

---

[4]*Bullock,*    Respondent's    Brief    in    Opposition,    p.    25-26 (http://sblog.s3.amazonaws.com/wpcontent/uploads/2012/05/Montana_brief_to_SCO TUS-5-18-12.pdf); *see also* Amicus Curiae Brief of Retired Justices of The Montana Supreme Court and Justice at Stake in Support of Respondent (http://brennan.3cdn.net/ 282cf914919d7db474 _rom6bn321.pdf); Brief for the States Of New York, Arkansas, California, Connecticut, Delaware, Hawaii, Idaho, Illinois, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Mississippi, Nevada, New Mexico, North Carolina, Rhode Island, Utah, Vermont, Washington, West Virginia, and the District of Columbia, as Amici Curiae in Support of Respondents, p. 18 ("This Court has not yet addressed whether a State's interest in preventing improper influence and the appearance of such influence over judicial, quasi-judicial, and law enforcement officials may support a state law regulating campaign expenditures, particularly when, as in this case, the law does not ban anyone    from    speaking.")    (http://www.ag.ny.gov/sites/default/files/pressreleases/2012/ATPvBullock-States-Brief-Supporting-Montana.pdf).

[5]The SEC Respondents have focused on the record supposedly before the Legislature and that produced by the Independent Commission on Judicial Reform.

Finally, Loughry relies on the Fourth Circuit's pre-*Bennett, pre-Davis* opinion in *Leake*. *Leake* did not find that the First Amendment applied differently in the context of judicial elections. Instead the issue was "whether the provision of matching funds burdens or chills speech in a way that implicates the First Amendment" at all. 524 F.3d at 437. Prior to *Bennett,* there was a split in the circuits on the question, and the *Leake* Court was convinced that there was no burden. *Id.* Of course, after *Bennett* and *Davis,* this holding is clearly in error. Because *Leake* found no chill on First Amendment rights, *id.* at 438, the *Leake* Court never considered whether the interests supported by the North Carolina act survived strict scrutiny. *Leake* is simply no longer good law. As the Court in *Bennett* noted:

> It is clear not only to us but to every other court to have considered the question after *Davis* that a candidate or independent group might not spend money if the direct result of that spending is additional funding to political adversaries. See, *e.g., Green Party of Conn.,* 616 F.3d, at 242 (matching funds impose "a substantial burden on the exercise of First Amendment rights" (internal quotation marks omitted)); *McComish v. Bennett,* 611 F.3d, at 524 (matching funds create "potential chilling effects" and "impose some First Amendment burden"); *Scott v. Roberts,* 612 F.3d 1279, 1290 (C.A.11 2010) ("we think it is obvious that the [matching funds] subsidy imposes a burden on [privately financed] candidates"); *id.,* at 1291 ("we know of no court that doubts that a [matching funds] subsidy like the one at issue here burdens" the speech of privately financed candidates); see also *Day v. Holahan,* 34 F.3d 1356, 1360 (C.A.8 1994) (it is "clear" that matching funds provisions infringe on "protected speech because of the chilling effect" they have "on the political speech of the person or group making the [triggering] expenditure" (cited in *Davis, supra,* at 739, 128 S.Ct. 2759)).

---

The similar record advanced in Montana, *see* 363 Mont. at 236-239, 271 P.3d at 11-13, did not persuade the United Sates Supreme Court. *Bullock,* 132 S.Ct. at 2491.

131 S.Ct. at 2823-24. The *Leake* Court's holding that the statute served "the state's interest in avoiding the danger of corruption (or the appearance thereof) in judicial elections" was rendered in the context of determining whether a ban on contributions twenty-one days prior to the election survived the lesser standard of exacting scrutiny, a standard the Court itself acknowledged does not require that the statute be narrowly tailored. *Id.* at 440-41.

Following *Bennett,* the North Carolina matching provisions for judicial elections, were again challenged. On May 18, 2012, the United States District Court for the Eastern District of North Carolina granted the plaintiffs' motion for summary judgment and found the North Carolina matching provisions unconstitutional based on *Bennett.*[6] *See NCRL PAC v. Leake,* No. 11-CV-472-FL [Doc. 41] (E.D.NC. 2012). The federal district court -- which unlike this Court is bound by Fourth Circuit opinions -- did not consider itself bound by *Leake I* because it recognized that *Bennett* now controlled. This Court should likewise reach the same conclusion. Following *Bennett* no court has approved the use of these kind of provisions in any elections.

## CONCLUSION

Five opinions of the Supreme Court of the United States compel the conclusion that the burden on speech by the additional funds provisions of the Act is not

---

[6]That North Carolina was unable to set forth a credible defense to the constitutionality of its matching funds provision after *Bennett* says more about the constitutional faults in the provision than the persuasive value of the precedent.

31

supported by any compelling state interest that is narrowly tailored to the interest. The provision is simply unconstitutional.   As the Respondents should not and cannot implement a statutory provision that is unconstitutional, this Court should deny the writ and dismiss this proceeding.

INTERVENOR MICHAEL CALLAGHAN
By Counsel

Anthony J. Majestro (WVSB 5165)
Powell & Majestro PLLC
405 Capitol Street, Suite P1200
Charleston, WV  25301
Phone:  304-346-2889
Fax:      304-346-2895
amajestro@powellmajestro.com

## <u>VERIFICATION</u>

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:


I, Michael Callaghan, after first being duly sworn upon oath, state that I am the Intervenor named in the attached and foregoing Response to Petition for Writ of Mandamus, that I have read the same, and that the facts and allegations therein contained are true and correct, except insofar as they are therein stated to be on information and belief, and that, insofar as they are stated therein to be on information and belief, I believe them to be true.

_____
**Michael Callaghan**


Taken, sworn to, and subscribed before me this ___10___ day of August, 2012.

My commission expires ___10 - 16 - 2016___.


_____
**Notary Public**

```
OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Rebecca G. Drumheller
Neely & Callaghan
159 Summers St.
Charleston, WV 25301
My Commission Expires Oct. 16, 2016
```

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

STATE OF WEST VIRGINIA, ex rel,
ALLEN H. LOUGHRY, II, candidate for the
Supreme Court of Appeals of West Virginia

          Petitioner,

vs.)                                            No. 12-0899

NATALIE E. TENNANT, in her official capacity as
West Virginia Secretary of State;
NATALIE E. TENNANT, GARY A. COLLIAS,
WILLIAM N. RENZELLI, and ROBERT RUPP in
their official capacities as members of the West Virginia
State Election Commission; GLENN B. GAINER, III,
in his official capacity as the West Virginia State Auditor;
and JOHN PERDUE, in his official capacity as the
West Virginia State Treasurer,

          Respondents.

## CERTIFICATE OF SERVICE

On August 10, 2012, comes the undersigned counsel and does hereby certify that service of
the attached Intervenor Michael Callaghan's Response to Petition for Writ of Mandamus
has been made upon the opposing parties by mailing a true and exact copy thereof by U.S.
Mail to the addresses below:

| | |
|---|---|
| Marc E. Williams, Esq. | J. Adam Skaggs, Esq. |
| Randall L. Saunders, Esq. | Matthew Menendez, Esq. |
| Jenna E. Hess, Esq. | Brennan Center for Justice at NYU School of |
| Nelson, Mullins, Riley & Scarbrough, LLP | Law |
| 949 Third Avenue, Suite 200 | 161 Avenue of the Americas, 12th Floor |
| Huntington, WV 25701 | New York, NY 10013 |
| *Counsel for Petitioner* | *Counsel for Petitioner* |
| | |
| | Lisa Hopkins, General Counsel |
| Honorable Darrell V. McGraw, Jr., Esq. | West Virginia State Auditor |
| Silas Taylor, Esq. | State Capitol, Building 1, Room W-100 |
| West Virginia Attorney General | 1900 Kanawha Blvd., East |
| Room 26-E, Building 1 | Charleston, WV 25305 |
| 1900 Kanawha Blvd., East | *Counsel for Respondent Gainer* |
| Charleston, WV 25305 | |
| *Counsel for Respondents Tennant, Collias, Renzelli & Rupp* | |

34

Diana Stout, Esq.
West Virginia State Treasurer
State Capitol, Building 1, Room E-12201
1900 Kanawha Blvd., East
Charleston, WV 25305
Counsel for Respondent Perdue

Anthony J. Majestro (WVSB 5165)
Powell & Majestro, PLLC
405 Capitol Street, Suite P1200
Charleston, WV 25301
Phone: 304-346-2889
Fax:   304-346-2895