IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

MICHAEL CALLAGHAN,

       Plaintiff,

v.                                      Civil Action No. 2:12-cv-03419

NATALIE E. TENNANT, in her
official capacity as West Virginia
Secretary of State; NATALIE E. TENNANT,
GARY A. COLLIAS, WILLIAM N. RENZELLI,
and ROBERT RUPP in their official capacities
as members of the West Virginia State
Election Commission,

       Defendants.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

In *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 131 S. Ct. 2806 (2011), the Supreme Court invalidated provisions in Arizona's public campaign finance statutes that provided additional funds to legislative and executive candidates participating in public financing.  The additional funds were based on the spending by nonparticipating candidates or third-parties conducting independent expenditures.  The *Bennett* Court concluded that the provision of additional funds to a publicly financed candidate based on the spending of privately financed candidates and/or third parties "imposes an unprecedented penalty on any candidate who robustly exercises [his] First Amendment right[s]."  131 S.Ct. at 2812 (quoting *Davis v. Federal Election Com'n*, 554 U.S. 724, 739 (2008).

1

The central issue in this case is whether the holding in *Bennett* applies to all elections or whether a different rule applies in judicial elections.

The Intervenor and the Defendants argue that *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009) supports a different rule.  *Caperton* held that due process required recusal of a Justice who had been the beneficiary of unprecedented campaign expenditures paid for by a litigant with a pending case.  Recusal was required because the expenditures in that case created "a serious, objective risk of *actual bias.*" 556 U.S. at 886 (emphasis added).

Both before and after *Caperton,* however, the Supreme Court rejected the idea that judicial elections are different.  In *Republican Party of Minnesota v. White*, 536 U.S. 765, 784 (2002), the Court struck down limits on what judicial candidates could tell the voters about their opinions on issues that might come before them.  The *White* Court explicitly rejected the claim that the rationale underlying unconstrained speech in elections for political office did not carry over to judicial campaigns. *Id.*

In *Citizens United v. F.E.C.*, 130 S.Ct. 876 (2010), the Court expressly rejected *Caperton's* application to campaign finance restrictions expressly concluding that "*Caperton's* holding was limited to the rule that the judge must be recused, not that the litigant's political speech could be banned." 130 S.Ct. at 910.  Indeed, this Court has recognized that "*Caperton* dealt with the Fourteenth Amendment and recusal rules, not the First Amendment's free speech guarantees." *Stay the Course West Virginia v. Tennant*, 2012 WL 3263623, 8  (S.D.W.Va. 2012).

2

Finally, in *In American Tradition Partnership, Inc. v. Bullock,* 132 S.Ct. 2490 (per curium) (2012), the Supreme Court of the United States summarily rejected the same arguments raised by the Defendants and Loughry in this action. At issue in *Bullock* was Montana's ban on corporate campaign expenditures, the same issue before the Court in *Citizens United. Western Tradition Partnership, Inc. v. Attorney General of State*, 363 Mont. 220, 226-228, 271 P.3d 1, 5-6 (2011). The Montana Court attempted to distinguish *Citizens United* in part by relying on *Caperton's* holding and the fact that Montana elected its judiciary. 363 Mont. at 236-239, 271 P.3d at 11-13. Those arguments, however, were rejected in the Supreme Court of the United States which summarily reversed the Montana court judgment in its entirety finding the arguments were "already rejected in *Citizens United*, or fail to meaningfully distinguish that case. *Bullock*, 132 S.Ct. at 2491 (emphasis added).

In sum, five opinions of the Supreme Court of the United States -- *White, supra, Davis, supra, Bennett, supra, Citizens United, supra, and Bullock, supra* – all compel the conclusion that the additional funds provisions in the Act unconstitutionally burden speech notwithstanding the fact that the burdens are imposed in the context of a judicial election.

Plaintiff, Michael Callaghan, has filed a Motion for a Preliminary Injunction. Plaintiff now files this Memorandum in Support of that Motion.

3

## STATEMENT OF FACTS

The West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program ("the Act") was established in 2010 as a pilot program for the 2012 primary election and the 2012 general election for the office of Justice of the Supreme Court of Appeals.   W.Va. Code § 3-12-1.   In 2012, the voters will elect two of the five Justices to twelve-year terms.   The Act sunsets following this election.   W.Va. Code § 3-12-17.

Eight candidates sought nomination in the May 8, 2012, West Virginia primary. Only one candidate, Allan Loughry, qualified to participate in the pilot project.   Ex. A at 24-25.

In the primary, Loughry and John Yoder received the Republican Party nominations in an uncontested primary.   Current Justice Robin Jean Davis and candidate Letitia "Tish" Chafin received the Democratic Party's nominations after receiving the two highest vote totals of the six candidates seeking the nomination.

Loughry raised $36,295 in order to qualify for the taxpayer subsidies provided by the pilot project.   Ex. A at 24.   The West Virginia State Election Commission ("Commission") thereupon certified Loughry to receive taxpayer funding.   Ex. A at 25.   As a certified candidate in an uncontested primary, Loughry received $13,705 from the public fund to give him $50,000.00 to spend on an uncontested primary. Ex. A at 25; *see also* W.Va. Code § 3-12-11(a)(2).

Once Loughry was certified as the Republican nominee, the Commission authorized the distribution of $350,000.00 in public funds to Loughry, the amount

4

available to a participating candidate in a contested election.  Ex. A at 27; *see also* W.Va. Code § 3-12-11(b)(1).

The Act contains two provisions that purport to provide matching funds to certified candidates participating in the pilot project:

> (e) If the commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that a nonparticipating candidate's campaign expenditures or obligations, in the aggregate, have exceeded by twenty percent the initial funding available under this section any certified candidate running for the same office, the commission shall authorize the release of additional funds in the amount of the reported excess to any opposing certified candidate for the same office.

> (f) If the State Election Commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that independent expenditures on behalf of a nonparticipating candidate, either alone or in combination with the nonparticipating candidate's campaign expenditures or obligations, have exceeded by twenty percent the initial funding available under this section to any certified candidate running for the same office, the commission shall authorize the release of additional funds in the amount of the reported excess to any certified candidate who is an opponent for the same office.

W.Va. Code § 3-12-11.

Under these additional funds provisions in the Act, a participating candidate in a contested general election can receive up to $700,000.00 in additional public funds triggered by expenditures by nonparticipating candidates or independent expenditures by third parties.  W.Va. Code § 3-12-11(h).  Once it has been determined by the Commission that the matching funds provisions have been triggered, the Act requires that the funds be issued to the participating candidate within two business days.  W.Va. Code § 3-12-11(i).

5

While the Act is not clear on the question, the regulations enacted implementing the Act make it clear that an expenditure of one dollar in excess of the 20% threshold results in the participating candidate receiving contributions matching the nonparticipating candidate's expenditures in excess of $350,000.00 up to an additional $700,000.00 in public funds.  W.V.C.S.R. § 146-5-8.8(d).

The regulations contain reporting requirements for nonparticipating candidates and persons conducting independent expenditures in the 2012 Supreme Court general election.  W.V.C.S.R. § 146-5-12.2 (nonparticipating candidates); *id.* at § 146-5-13 (independent expenditures).  Under these regulations, nonparticipating candidates were required to report to the Secretary of State by July 7, 2012, "a listing of expenditures and obligations incurred since May 9, 2012 through July 1, 2012, if those expenditures and obligations, in the aggregate, exceed $350,000." *Id.* at § 12.2.a.

The West Virginia Act was based on Article 22D of North Carolina's "Elections and Election Laws," G.S. §§ 163-278.62 through 163-278.70, which became effective in 2002.  Litigation challenging the constitutionality of the North Carolina law commenced in 2006.  Ultimately, the United States Court of Appeals for the Fourth Circuit upheld the constitutionality of the North Carolina statute.  *North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake*, 524 F.3d 427 (4th Cir.  2008). The Supreme Court of the United States denied certiorari. 555 U.S. 994 (2008).

6

The West Virginia Act was enacted in 2010.  A year after its enactment, the Supreme Court of the United States decided *Bennett*.  In *Bennett,* the Court applied strict scrutiny and struck down Arizona's matching funds provision which applied only to legislative and executive races.  Notably, in striking down the Arizona statute, the Supreme Court in *Bennett* specifically characterized the North Carolina act as having "matching funds statutes that resemble Arizona's law." *Id.* at 2816 n.3.

Following the decision in *Bennett,* the West Virginia Election Commission sought an opinion from the West Virginia Attorney General regarding the constitutionality of the matching funds provision of the West Virginia Act.  App. at 21.  The Attorney General responded on July 28, 2011, concluding that the Act's matching funds provision could not survive the strict scrutiny analysis mandated by *Bennett.  See* Doc 1-1 at 3-5.

Following the receipt of the Attorney General's opinion, the Secretary of State publicly announced that she intended to follow the Attorney General's opinion and not implement the matching funds provisions of the Act.   *See* http://www.wvrecord.com/news/245447-former-w.va.-democratic-party-chairman-challenges-candidate-financing-program. The Commission was informed of this decision.  Ex. A at 23.

Notably, Loughry made the decision to participate in the pilot project after *Bennett* was decided and after the Defendants indicated they would not, based on

*Bennett,* implement the additional funds provisions of the Act. Ex. A at 24; Doc. 18-3 at 59.

On June 21, 2012, Loughry appeared at a regularly scheduled meeting of the Commission and requested that the Commission take a position on whether it would fully implement the matching funds provision. Ex. A at 27-28. The Commission refused to take a position. Ex. A at 28.

On June 22, 2012, the disclosure provision set forth in W.V.C.S.R. § 146-5-12.2 was implemented through the promulgation of a reporting form. The nonparticipating candidates were notified by e-mail of the new form and the requirement that it be filed by July 6, 2012. While § 12.2 of the regulations contemplates disclosure once expenditures exceed $350,000.00, the form provided to the candidates by the Secretary's election division required disclosure only when candidates expended or committed $420,000.00, the trigger for the additional payments. On July 6, 2012, Justice Davis, a nonparticipating candidate, filed the form provided to the nonparticipating candidates. Her filing showed expenditures of $494,471.00. *See* Doc. 18-3 at 62.

On July 17, 2012, an emergency meeting of the Commission was held in Charleston, West Virginia. Ex. A at 30-31. The Commission voted to acknowledge that Justice Davis had expended sufficient sums to trigger the matching funds provisions under the Act. *Id.* The Commission then proceeded to vote on a motion to authorize the release of matching funds to Loughry. *Id.* The motion failed on a

tie vote of the four members.  The debate regarding the motions centered on the constitutionality of the matching provisions.  Ex. A at 32.

Michael Callaghan is a practicing attorney and small business owner. Ex. B at 1. On July 18, 2012, Michael Callaghan filed this lawsuit in the United States District Court for the Southern District of West Virginia challenging the constitutionality of the additional funds provisions of the Act. Callaghan makes contributions to candidates for elected office in West Virginia and wishes to make contributions to the two non-participating candidates nominated by the Democratic Party for the 2012 election to the Supreme Court of Appeals of West Virginia. *Id.* at 1. Callaghan, together and in combination with others, also wishes to conduct independent expenditures in favor of candidates who oppose public financing and/or in opposition to candidates who accept public funds to support their campaigns. *Id. at* 2.  Because the expenditures would trigger additional funds to one of the opposing candidates, Callaghan will not do so which chill his rights to unencumbered speech protected by the First Amendment. *Id.*

STANDARD FOR GRANTING THE MOTION

In this Circuit a litigant is entitled to a preliminary injunction if he can establish:

> [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

*Real Truth About Obama, Inc. v. Federal Election Com'n*, 575 F.3d 342, 346 (4th Cir. 2009) ("*RTAO I*") (citation to and quotation of *Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 7, 374-76 (2008) omitted).[1]  All four requirements must be satisfied.  *RTAO I,* 575 F.3d at 346.

The Courts in this district have not hesitated to grant preliminary injunctions in the context of election restrictions that imperil free speech rights guaranteed by the First Amendment whether based on *Winter/RTAO I* or *Blackwelder*.  *See, e.g., Stay the Course West Virginia v. Tennant*, 2012 WL 3263623 (S.D.W.Va. 2012) (granting preliminary injunction applying *Winter/RTAO I* standard); *West Virginians for Life, Inc. v. Smith,* 919 F.Supp. 954 (S.D.W.Va. 1996) (granting preliminary injunction applying *Blackwelder*); *Center for Individual Freedom, Inc. v. Ireland*, 2008 WL 1837324 (S.D.W.Va. 2008) ("*CFIF I*") (same); *Center for Individual Freedom, Inc. v. Ireland*, 613 F.Supp.2d 777 (S.D.W.Va. 2009) ("*CFIF II*") (same).

## ARGUMENT

### I.   CALLAGHAN IS ENTITLED TO JUDGMENT ON HIS CLAIMS THAT THE ADDITIONAL FUNDS PROVISIONS IN THE ACT ARE UNCONSTITUTIONAL.

The central issue with respect to the motion for preliminary relief is whether the Plaintiff is likely to be entitled to judgment on the merits.  *WV Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009) ("in the

---

[1] The Court in *RTAO I*  found that *Winter* overruled this Circuit's prior standard for granting a preliminary injunction set forth in *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977).  *RTAO I,* 575 F.3d at 346-47.  *RTAO I*, however, was vacated and remanded on other grounds by the Supreme Court of the United States.  *See The Real Truth About Obama, Inc. v. Federal Election Commission,* 130 S.Ct. 2371 (2010) (per curium).  On remand, the Fourth Circuit reinstated the portion of *RTAO I's* holding addressing the preliminary injunction standard.  *The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010) (per curium).

context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim. Therefore, we focus our review on the merits of plaintiff's First Amendment claim." (quoting *WV Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave*, 512 F.Supp.2d 424, 429 (S.D.W.Va. 2007)). For the reasons noted below, Callaghan has established a strong showing that he is likely to succeed on the merits.

> ### A.   Because the Additional Funds Provisions in the Act are a Substantial Burden on Candidate and Third-Party Expenditures Implicating the Right to Free Speech Protected by the First Amendment, they are Subject to Review under the Strict Scrutiny Test.

The First Amendment protects citizens from laws "abridging the freedom of speech." U.S. Const., Amend. 1. In *Bennett,* the Court emphasized the special importance that these protections hold in the context of a campaign:

> "Discussion of public issues and debate on the qualifications of candidates are integral to the operation" of our system of government. *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*per curiam*). As a result, the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (quoting *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)).

*Bennett,* 131 S.Ct. at 2817 (emphasis added).

In *Bennett,* the Court considered the constitutionality of Arizona's public finance statute which, like the Act here, provided an initial award of public funds to a participating candidate and additional sums to the publicly funded candidate if the privately financed candidate or a third-party expended funds in excess of the initial

11

grant. 131 S.Ct. at 2815-16. The Supreme Court concluded that the provision "imposes an unprecedented penalty on any candidate who robustly exercises [his] First Amendment right[s]." 131 S.Ct. at 2812 (quoting *Davis,* 554 U.S. at 739). With respect to independent expenditure groups, the *Bennett* Court concluded that the burden was even greater than the burden imposed on privately financed candidates because, while candidates have the choice of accepting public funds if they decide that the burdens imposed by the matching funds regime make a privately funded campaign unattractive, individuals or organizations desiring to support or oppose a candidate do not. 131 S.Ct. at 2819.

The Court explained that the additional funds provisions burden speech in several ways. First, the threat of additional funds chills candidates from speaking by threatening speech with the "direct an automatic release of public money." *Id.* The Act here causes even a greater chill due to the implementation of the trigger. A nonparticipating candidate can spend up to $420,000.00 before triggering additional funds; however, if one dollar more is spent by the non-participating candidate, the participating candidate receives taxpayer funds matching the nonparticipating candidate's entire expenditures in excess of $350,000.00. W.V.C.S.R. § 146-5-8.8(d). Thus, one dollar expenditure could be matched seventy times with public funds. *Bennett* characterized a much smaller multiplier effect as a "significant burden." 131 S.Ct. at 2819.

The *Bennett* Court found a final burden due to the disparity of control inherent in the additional funds provision:

> Even if that candidate opted to spend less than the initial public financing cap, any spending by independent expenditure groups to promote the privately financed candidate's election—regardless whether such support was welcome or helpful—could trigger matching funds. What is more, that state money would go directly to the publicly funded candidate to use as he saw fit. That disparity in control—giving money directly to a publicly financed candidate, in response to independent expenditures that cannot be coordinated with the privately funded candidate—is a substantial advantage for the publicly funded candidate. That candidate can allocate the money according to his own campaign strategy, which the privately financed candidate could not do with the independent group expenditures that triggered the matching funds.

131 S.Ct. at 2819.  This lack of control is even more pronounced here as the multiple seat race results in the participating candidate receiving taxpayer funds if one of the nonparticipating candidates opts to exceed the trigger even if the other two privately financed candidates do not.

Because the additional funds provision "imposes a substantial burden on the speech of privately financed candidates and independent expenditure groups" strict scrutiny applies. *Bennett,* 131 S.Ct. at 2824.  As the Supreme Court held in *Citizens United*:

> [P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.

130   Ct. at 898 (citations and internal quotations omitted).  In addition, when the Government seeks to regulate protected speech, the restriction must be the "least restrictive means among available, effective alternatives."   *U.S. v. Alvarez*, 132 S.Ct. 2537, 2551 (2012) (plurality opinion) (citation and internal quotations omitted); *see also Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997)

13

("That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.").

      B.    **The Act's Additional Funds Provisions do not Serve a Compelling State Interest and are not Narrowly Tailored to the Purported State Interest.**

*Bennett* rejected the claim that providing a publicly financed candidate with additional funds to match the spending of privately financed candidates and independent persons or groups served any compelling state interest. Loughry and the Defendants attempt to distinguish this binding precedent by arguing that judicial elections, which were not at issue in *Bennett,* are different. These arguments ignore numerous opinions of the Supreme Court of the United States that establish that the additional funds provisions of the Act cannot meet the strict scrutiny test.

First, *Bennett* rejected the claim that the provision could be justified by a desire to "level the playing field" holding that "[l]eveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election — a dangerous enterprise and one that cannot justify burdening protected speech." 131 S.Ct. at 2826.

Second, *Bennett* rejected the idea that the additional funds provisions served a compelling interest in combating corruption and the appearance of corruption holding that "the burdens that the matching funds provision imposes on protected political speech are not justified." 131 S.Ct. at 2826. With respect to candidate

14

expenditure, the Court focused on the burden on a candidate who funds his own

campaign:

> Indeed, we have said that "reliance on personal funds *reduces* the threat of
> corruption" and that "discouraging [the] use of personal funds[ ] disserves the
> anticorruption interest." *Davis, supra,* at 740–741, 128 S.Ct. 2759. That is
> because "the use of personal funds reduces the candidate's dependence on
> outside contributions and thereby counteracts the coercive pressures and
> attendant risks of abuse" of money in politics. *Buckley, supra,* at 53, 96 S.Ct.
> 612. The matching funds provision counts a candidate's expenditures of his
> own money on his own campaign as contributions, and to that extent cannot
> be supported by any anticorruption interest.

131 S.Ct. at 2826. With respect to independent expenditures, the Court noted:

> We have also held that "independent expenditures ... do not give rise to
> corruption or the appearance of corruption." *Citizens United,* 558 U.S., at ——
> –, 130 S.Ct., at 909. "By definition, an independent expenditure is political
> speech presented to the electorate that is not coordinated with a candidate."
> *Id.,* at ——, 130 S.Ct., at 910. The candidate-funding circuit is broken. The
> separation between candidates and independent expenditure groups negates
> the possibility that independent expenditures will result in the sort of *quid
> pro quo* corruption with which our case law is concerned. See *id.,* at —— – ——
> ——, 130 S.Ct., at 909–911; cf. *Buckley,* 424 U.S., at 46, 96 S.Ct. 612. Including
> independent expenditures in the matching funds provision cannot be
> supported by any anticorruption interest.

*Bennett,* 131 S.Ct. at 2826-27. Finally, the *Bennett* Court rejected the idea that the

additional funds served the interest of encouraging participating in public

financing. *Id.* at 2827.

Loughry and the Defendants' primary argument in support of the Act is that

*Caperton* somehow allows them to distinguish *Bennett.* This Argument both

misreads *Caperton* and ignores a number of decisions of the Supreme Court

rejecting the idea that judicial elections are different for the purposes of the First

Amendment and confirming that *Caperton* does not support a less robust right to speech.

        1.      ***Caperton* Does not Support the Act's Restrictions on Speech.**

    The argument advanced by Loughry and the Defendants is that avoiding the appearance of impropriety is a requirement of due process and that avoiding these appearances is therefore a compelling state interest served by the Act.   *Caperton* does not support this argument.

    First, *Caperton* did not hold that avoiding the appearance of impropriety was a requirement of due process.   Instead, *Caperton* held that "Not every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal."   556 U.S. at 884.   The Court found the contribution in *Caperton* was unprecedented.   556 U.S. at 887 ("The facts now before us are extreme by any measure. The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case.").   Due process required recusal in *Caperton* not because of appearances; instead, due process required recusal because the expenditures in that case created "a serious, objective risk of *actual bias*." 556 U.S. at 886 (emphasis added).

    The Act here cannot be justified as preventing the contributions at issue in *Caperton.*   First, the Act's match of funds is capped at $700,000.00.   W. Va. Code § 3-12-11(h).   The $3,000,000.00 expenditure in *Caperton* was made in spite of the fact that an opposing independent expenditure group spent approximately $2,000,000.00.   *See http:// forms. irs. gov/ political Orgs Search/*

*search/gotoSearchDrillDown.action?pacId='22659'* & *criteriaName='*
*West+Virginia+ Consumers+for+Justice'.* There are no findings or evidence to
support the conclusion that providing limited matching funds will dissuade large
independent expenditures like the one in *Caperton*.

Second, as applied to this election, the majority of the large expenditures have
been candidate self-financing. *See* "Davis, Chafin win Democratic primary for
Supreme Court," *Charleston Daily Mail* (May 8, 2012)
(http://www.dailymail.com/News/201205080273). What was true with respect to the
legislative races in *Bennett* is also true with the judicial races here. Self-funding
serves the very interest in an unbiased judiciary that Loughry and the Defendants
claim supports the Act. Self-funded candidates simply cannot be perceived as
beholden to their contributors.

*Caperton's* holding that extremely large expenditures by a candidate require
recusal both creates the solution to the supposed perception problem and acts as a
deterrent to spending by litigants. Because *Caperton* requires recusal when
extreme spending on a judicial election occurs, a litigant will be reluctant to engage
in this type of spending. Moreover, because *Caperton* requires recusal in response
to extreme spending, the decision itself creates the solution to the appearances
problem Loughery advances. If a Justice is the beneficiary of *Caperton* level
expenditures, it is clear that recusal is now mandatory and the appearance problem
identified by Loughry and the Defendants is solved. Thus, the Act cannot be

17

justified by the prevention of *Caperton* like spending because the justification is not narrowly tailored.

While it is true that the *Caperton* recusal motion will be a rare one, nothing prevents the State from adopting stricter recusal rules. "The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today." 556 U.S. at 889-90 (citation and internal quotation omitted). Because stricter recusal rules are an available, effective alternative that does not trample on protected speech,[2] the purported interest in avoiding appearances of conflicts fails strict scrutiny review. *Alverez, supra; Reno, supra.*

> ## 2.   The Supreme Court has rejected a Judicial Election Distinction to its First Amendment Jurisprudence and Specifically Rejected the interpretation of *Caperton* Advanced by Loughry and the Defendants.

United States Supreme Court has consistently rejected any judicial election distinction in its First Amendment jurisprudence. First, the *Bennett* Court characterized North Carolina's judicial public finance statute as one that "resemble[s]" the Arizona statute at issue in *Bennett.* 131 S.Ct. at 2816, n.3. The Court has also explicitly rejected any constitutional distinction in judicial elections:

> Justice GINSBURG greatly exaggerates the difference between judicial and legislative elections. She asserts that "the rationale underlying unconstrained speech in elections for political office-that representative

---

[2]*See, e.g.,* Adam Skaggs and Andrew Silver, Promoting Fair and Impartial Courts through Recusal Reform, *Brennan Center for Justice*, August, 2011 (http://brennan.3cdn.net/ 09c926c04c9eed5290_e4m6iv2v0.pdf).

> government depends on the public's ability to choose agents who will act at
> its behest-does not carry over to campaigns for the bench." *Post*, at 2551. This
> complete separation of the judiciary from the enterprise of "representative
> government" might have some truth in those countries where judges neither
> make law themselves nor set aside the laws enacted by the legislature. It is
> not a true picture of the American system. Not only do state-court judges
> possess the power to "make" common law, but they have the immense power
> to shape the States' constitutions as well.

*White*, 536 U.S. at 784; *see also id.* at 792 (O'Connor, J., concurring) ("In [choosing to elect judges] the State has voluntarily taken on the risks to judicial bias described above. As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling."); *id.* at 795 (Kennedy, J., concurring) ("The State cannot opt for an elected judiciary and then assert that its democracy, in order to work as desired, compels the abridgment of speech."). Thus for the purposes of the First Amendment, a state that chooses to elect judges cannot justify the abridgment of the fundamental right to freedom of speech on the grounds that the elections are for judicial offices.

If there was any doubt that *Caperton* did not change the rules to create less robust speech protections in judicial elections, two subsequent decisions settled the issue – *Citizens United* and *Bullock.*

First, in *Citizens United,* the Court expressly rejected *Caperton's* application to campaign finance restrictions:

> *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d
> 1208 (2009), is not to the contrary. *Caperton* held that a judge was required
> to recuse himself "when a person with a personal stake in a particular case
> had a significant and disproportionate influence in placing the judge on the
> case by raising funds or directing the judge's election campaign when the case
> was pending or imminent." *Id.,* at ——, 129 S.Ct., at 2263–2264. The remedy
> of recusal was based on a litigant's due process right to a fair trial before an

unbiased judge. See *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). *Caperton 's holding was limited to the rule that the judge must be recused, not that the litigant's political speech could be banned.*

*Citizens United*, 130 S.Ct. at 910.  Thus, *Citizens United* made it clear that the due process concerns in *Caperton* were not compelling interests that withstood a First Amendment challenge when the strict scrutiny standard governed.  This Court has recently recognized this distinction. *Stay the Course West Virginia v. Tennant*, 2012 WL 3263623, 8  (S.D.W.Va. 2012) ("However, *Caperton* dealt with the Fourteenth Amendment and recusal rules, not the First Amendment's free speech guarantees.").

More recently in *Bullock,* Supreme Court of the United States summarily rejected the same arguments raised by Loughry here.  At issue in *Bullock,* was Montana's ban on corporate campaign expenditures, a ban subject to strict scrutiny. *See Western Tradition Partnership, Inc. v. Attorney General of State*, 363 Mont. 220, 271 P.3d 1 (2011).  The Montana Supreme Court recognized that the Court in *Citizens United* applied strict scrutiny and invalidated a ban on electioneering communications in *federal* elections.  363 Mont. 220, 226-228, 271 P.3d 1, 5-6.  The Montana Court, however, attempted to distinguish *Citizens United* in part by relying on *Caperton* and the fact that Montana elected its judiciary.

To support its holding that Montana had a compelling state interest sufficient to support the burdens on speech in the Montana laws, the Montana Court noted:

¶ 39 Montana also has a compelling interest in protecting and preserving its system of elected judges. In this State, the people elect the Justices of the Supreme Court, the Judges of the District Courts, and most lower court judges as well. . . .

The people of the State of Montana have a continuing and compelling interest in, and a constitutional right to, an independent, fair and impartial judiciary. The State has a concomitant interest in preserving the appearance of judicial propriety and independence so as to maintain the public's trust and confidence. In the present case, the free speech rights of the corporations are no more important than the due process rights of litigants in Montana courts to a fair and independent judiciary, and both are constitutionally protected. . . .

¶ 43 The United States Supreme Court has affirmed the importance of judicial integrity and in maintaining public respect for the judiciary.

"Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. *Judicial integrity is, in consequence, a state interest of the highest order.*" [Emphasis added.]

*Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, ——, 129 S.Ct. 2252, 2266–67, 173 L.Ed.2d 1208 (2009) (quoting *Republican Party of Minn. v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002)). The Court also recognizes the importance of state codes of judicial conduct, which "serve to maintain the integrity of the judiciary and the rule of law." *Caperton,* 556 U.S. at ——, 129 S.Ct. at 2266. States have a "compelling interest" in preventing judges from activities that "would undermine actual impartiality, as well as its appearance." *Bauer v. Shepard,* 620 F.3d 704, 711 (7th Cir.2010) (upholding limits on judges acting in posts of political leadership and delivering political speeches). "The state certainly has a compelling state interest in the public's trust and confidence in the integrity of our judicial system." *Simes v. Ark. Judicial Discipline and Disability Comm.,* 368 Ark. 577, 247 S.W.3d 876, 882 (2007).

363 Mont. at 236-239, 271 P.3d at 11-13.  Notably, in support of its holding, the

Montana Supreme Court made many of the same arguments relied on by Loughry

and the Defendants.

21

Those arguments, however, were summarily rejected by the Supreme Court of the United States.   After staying the Montana decision to permit review, the Supreme Court summarily reversed:

> A Montana state law provides that a "corporation may not make ... an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party." Mont.Code Ann. § 13–35–227(1) (2011). The Montana Supreme Court rejected petitioners' claim that this statute violates the First Amendment. 2011 MT 328, 363 Mont. 220, 271 P.3d 1. In *Citizens United v. Federal Election Commission,* this Court struck down a similar federal law, holding that "political speech does not lose First Amendment protection simply because its source is a corporation." 558 U.S. ——, ——, 130 S.Ct. 876, 900, 175 L.Ed.2d 753 (2010) (internal quotation marks omitted). The question presented in this case is whether the holding of *Citizens United* applies to the Montana state law. There can be no serious doubt that it does. See U.S. Const., Art. VI, cl. 2. *Montana's arguments in support of the judgment below either were already rejected in Citizens United, or fail to meaningfully distinguish that case.*

*Bullock*, 132 S.Ct. at 2491 (emphasis added).   A review of the briefs filed in the United States Supreme Court makes it clear that the supposed compelling interest in regulating speech in judicial races was directly presented to the United States Supreme Court in *Bullock*.[3]   Thus, the *Bullock* Court rejected the reading of

---

[3]   *Bullock,* Respondent's Brief in Opposition, p. 25-26 (http://sblog.s3.amazonaws.com/wpcontent/uploads/2012/05/Montana_brief_to_SCO TUS-5-18-12.pdf); *see also* Amicus Curiae Brief of Retired Justices of The Montana Supreme Court and Justice at Stake in Support of Respondent (http://brennan.3cdn.net/  282cf914919d7db474  _rom6bn321.pdf); Brief for the States Of New York, Arkansas, California, Connecticut, Delaware, Hawaii, Idaho, Illinois, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Mississippi, Nevada, New Mexico, North Carolina, Rhode Island, Utah, Vermont, Washington, West Virginia, and the District of Columbia, as Amici Curiae in Support of Respondents, p. 18 ("This Court has not yet addressed whether a State's interest in preventing improper influence and the appearance of such influence over judicial, quasi-judicial, and law enforcement officials may support a state law regulating campaign expenditures, particularly when, as in this case, the law does not ban

*Caperton* advanced by Loughry and the Defendants.  *Bullock's* rejection of the idea

that *Caperton* creates different rules for judicial elections is binding on this Court.[4]

Like the attempt to distinguish *Citizens United* in *Bullock,* any attempt to

distinguish *Bennett* here would not be likely to fair any better.[5]

    Finally, Loughry has relied in the past on the Fourth Circuit's pre-*Bennett, pre-*

*Davis* opinion in *Leake*.  *Leake* did not find that the First Amendment applied

differently in the context of judicial elections.  Instead, the issue was "whether the

provision of matching funds burdens or chills speech in a way that implicates the

First Amendment" at all.  524 F.3d at 437.  Prior to *Bennett,* there was a split in the

circuits on the question, and the *Leake* Court was convinced that there was no

burden on speech rights by the additional funds provisions there.  *Id.*  Of course,

after *Bennett* and *Davis,* this holding is clearly in error.  Not even Loughry and the

Defendants argue post-*Bennett* that additional funds provisions do not burden First

Amendment rights.   Thus, because *Leake* incorrectly found no chill on First

---

anyone      from      speaking.")      (http://www.ag.ny.gov/sites/default/files/press-
releases/2012/ATPvBullock-States-Brief-Supporting-Montana.pdf).

    [4]While the Supreme Court does not give full precedential weight to summary
dispositions, *see, e.g., Caban v. Mohammed,* 441 U.S. 380, 390 n.9 (1979), it expects
this Court to follow them.  *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975) ("The
District Court should have followed the Second Circuit's advice. . . . that the lower
courts are bound by summary decisions by this Court 'until such time as the Court
informs (them) that (they) are not.'" (quoting *Doe v. Hodgson*, 478 F.2d 537, 539 (2d
Cir. 1973)).

    [5]The Defendants have in the past focused on the record supposedly before the
Legislature and that produced by the Independent Commission on Judicial Reform.
The similar record advanced in Montana, *see* 363 Mont. at 236-239, 271 P.3d at 11-
13, did not persuade the United Sates Supreme Court.  *Bullock*, 132 S.Ct. at 2491.

Amendment rights, *id.* at 438, the *Leake* Court never considered whether the interests supported by the North Carolina act survived strict scrutiny.  As the Court in *Bennett* noted:

> It is clear not only to us but to every other court to have considered the question after *Davis* that a candidate or independent group might not spend money if the direct result of that spending is additional funding to political adversaries. See, *e.g., Green Party of Conn.*, 616 F.3d, at 242 (matching funds impose "a substantial burden on the exercise of First Amendment rights" (internal quotation marks omitted)); *McComish v. Bennett,* 611 F.3d, at 524 (matching funds create "potential chilling effects" and "impose some First Amendment burden"); *Scott v. Roberts,* 612 F.3d 1279, 1290 (C.A.11 2010) ("we think it is obvious that the [matching funds] subsidy imposes a burden on [privately financed] candidates"); *id.,* at 1291 ("we know of no court that doubts that a [matching funds] subsidy like the one at issue here burdens" the speech of privately financed candidates); see also *Day v. Holahan,* 34 F.3d 1356, 1360 (C.A.8 1994) (it is "clear" that matching funds provisions infringe on "protected speech because of the chilling effect" they have "on the political speech of the person or group making the [triggering] expenditure" (cited in *Davis, supra,* at 739, 128 S.Ct. 2759)).

131 S.Ct. at 2823-24.  *Leake* is simply no longer good law.

Following *Bennett,* the North Carolina matching provisions for judicial elections, were again challenged.  On May 18, 2012, the United States District Court for the Eastern District of North Carolina granted the plaintiffs' motion for summary judgment and found the North Carolina matching provisions unconstitutional based on *Bennett.*[6]  *See NCRL PAC v. Leake,* No. 11-CV-472-FL [Doc. 41] (E.D.NC. 2012). The federal district court -- which like this Court is bound by Fourth Circuit

---

[6]Loughry has suggested that this most recent decision in *Leake* is not worthy of precedent because the State of North Carolina did not actively oppose the merits of the motion for summary judgment.  That North Carolina was unable to set forth a credible defense to the constitutionality of its matching funds provision after *Bennett* says more about the constitutional faults in the provision than the persuasive value of the precedent.

24

opinions -- did not consider itself bound by *Leake I* because it recognized that *Bennett* now controlled.  This Court should likewise reach the same conclusion.  Following *Bennett,* no court has approved the use of these kind of additional fund provisions in any elections.

### C.   Callaghan has Standing to Challenge the Act's Additional Funds Provisions.

Loughry and the Defendants have argued that Callaghan lacks standing to challenge the constitutionality of W.Va. Code § 3-12-11(e) which contains a trigger for additional funds based solely on candidate expenditures.

Callaghan clearly has in interest in this litigation that is substantial.  First, as noted above, Callaghan seeks to participate in independent expenditures supporting two of the non-participating candidates and/or opposing Loughry.  He also seeks to make direct campaign contributions to Loughry's Democratic opponents.   For the reasons noted above, the release of the taxpayer funds sought by Loughry will impose a substantial burden on Callahan's speech and associational rights guaranteed by the First Amendment to the United States Constitution.  For the reasons noted herein, Callaghan clearly has standing to challenge these provisions.

There is no argument that Callaghan lacks standing to challenge the additional funds trigger in W.Va. Code § 3-12-11(e) which would provide Loughry additional taxpayer funds if Callaghan conducts an independent expenditure.    Indeed, as noted above, this is precisely one of the challenges upheld in *Bennett.*

Moreover, while Loughry is seeking additional funds based solely on candidate expenditures, Callaghan is still directly harmed because W.Va. Code § 3-12-11(e)

computes the additional funds available to Loughry based on the total of candidate and independent expenditures. Thus, the result of allowing candidate expenditures to count for purposes of assessing whether the trigger has been met when independent expenditures are made results in the provision of additional funds immediately after any independent expenditures as the . If the candidate expenditures were truly irrelevant to Callaghan's interests (as Defendants and Loughry argue), Callaghan would be able to conduct unmatched independent expenditures up to 20% of the $350,000.00 in initial taxpayer funds provided under W.Va. Code § 3-12-11(b)(1). Instead, Justice Davis' expenditures are counted and Loughry receives additional funds if Callaghan spends even $1.00. Finally, as a prospective contributor, Callaghan has an interest in seeing that his contributions are not unconstitutionally used to trigger additional funds to Loughery.

### D. The Disputed Provisions of the Act are not Severable and must Both be Struck as Unconstitutional.

In making the challenge to Callaghan's standing, Loughry and the Defendants assume that W.Va. Code § 3-12-11(e) is severable from a successful challenge to W.Va. Code § 3-12-11(f). It is not. Whether or not Callaghan has standing to challenge W.Va. Code § 3-12-11(e), because this subsection cannot be severed from W.Va. Code § 3-12-11(f), this Court's determination that W.Va. Code § 3-12-11(f) is unconstitutional necessarily voids W.Va. Code § 3-12-11(e).

First, it is clear that severability and standing are interrelated:

Plaintiffs have demonstrated that they have an injury in fact attributable to § 1A(B)(2)-(4) and that a favorable decision that § 1A is non-severable and void in its entirety will redress that injury. Thus, plaintiffs' claims regarding

26

§ 1A(B)(1) are justiciable even if plaintiffs could not bring a distinct claim seeking relief only in relation to that provision.

*Local 514 Transport Workers Union of America v. Keating*, 66 Fed.Appx. 768, 774, 2003 WL 2007934, 5 (10th Cir. 2003); *see also Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 998 (3rd Cir. 1993) (party has third-party standing to assert the rights of others "where the statute is not severable and therefore a party's challenge to the statute necessarily involves assertion of the rights of others affected by the statute." (citing *U.S. v. Raines,* 362 U.S. 17, 23 (1960)); *cf. FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230 (1990) (after finding plaintiffs successfully challenged certain provisions of ordinance, Court concluded they lacked standing to challenge other provisions of ordinance; Court, however,  remanded for determination of whether unconstitutional provisions of ordinance severable from remaining provisions plaintiffs lacked standing to challenge).  With respect to the actual severability determination, whether unconstitutional provisions of a state statute are severable "is of course a matter of state law." *Virginia v. Hicks*, 539 U.S. 113, 121 (2003).

In West Virginia, a court finding a statute unconstitutional must make an independent determination of whether the unconstitutional provision is severable. *Louk v. Cormier*, 218 W.Va. 81, 96-97, 622 S.E.2d 788, 803- 04 (2005) (plurality opinion); *Shenandoah Sales & Service, Inc. v. Assessor of Jefferson County*, 724 S.E.2d 733, 741-42 (2012).  This is true regardless of whether the statute in

question contains a severability clause.[7] *Shenandoah Sales & Service, supra* (citing *State ex rel. State Bldg. Comm'n v. Bailey,* 151 W.Va. 79, 93, 150 S.E.2d 449, 457 (1966)).

In determining severability, the Supreme Court of Appeals has traditionally applied the following test:

> "'A statute may contain constitutional and unconstitutional provisions which may be perfectly distinct and separable so that some may stand and others will fall; and if, when the unconstitutional portion of the statute is rejected, the remaining portion reflects the legislative will, is complete in itself, is capable of being executed independently of the rejected portion, and in all other respects is valid, such remaining portion will be upheld and sustained.' Point 6, syllabus, *State v. Heston,* 137 W.Va. 375 [71 S.E.2d 481]." Syl. Pt. 4, *State ex rel. State Building Comm'n v. Bailey,* 151 W.Va. 79, 150 S.E.2d 449 (1966).

*Syl. pt. 3, Frantz v. Palmer*, 211 W.Va. 188, 189-90, 564 S.E.2d 398, 399- 400 (2001); *see also Louk, supra* (same); *Shenandoah Sales & Service, Inc., supra* (citing *Frantz, supra; Louk, supra;* and *Bailey supra*).

Applying this test, it is clear that the additional funds provisions rise and fall together. Both provisions involve the same subject matter -- additional funds to a participating candidate based on expenditures supporting nonparticipating candidates or opposing the participating candidate. Indeed, as noted above, candidate expenditures are intertwined with independent expenditures in W.Va. Code § 3-12-11(f). The statutory findings detailing the supposed harms from judicial campaign expenditures make no distinction between candidate expenditures and independent expenditures. *See* W.Va. Code § 3-12-2(7), (8).

---

[7]The Act under review here does not contain a severability clause.

Moreover, it is doubtful that the Legislature would have wanted to expend taxpayer dollars addressing additional funds to counter the expenditures of self-financed candidates without addressing the supposed problem caused by independent expenditures.   The statutory scheme is simply incomplete without addressing both candidate expenditures and independent expenditures.

Finally, severability presumes that the remaining provisions are constitutional. For the remaining portions of the statute to "be upheld and sustained," it is necessary for them to be "in all other respects . . . valid." *Franz, supra.* West Virginia Code § 3-12-11(e) suffers from the same constitutional defect as W.Va. Code § 3-12-11(f).  Thus, it is not "in all other respects . . . valid" and the Court cannot merely sever W.Va. Code § 3-12-11(f) from the Act as its unconstitutionality prohibits this Court from separately upholding and sustaining it.  In the end, the severability test seeks the answer to the question of whether "the Legislature would have passed the one without the other." *Louk,* 218 W.Va. at 97, 622 S.E.2d at 804 (quoting syl. pt. 9, *Robertson v. Hatcher,* 148 W.Va. 239, 135 S.E.2d 675 (1964)).  It is doubtful that that the Legislature, whose members are required to take an oath to support the United States Constitution, W.Va. Const., art. 4, sec. 5, would have intended to leave one of two unconstitutional provisions in the Act.

* * * *

The decisions of the Supreme Court of the United Sates make it clear that the additional funds provisions in the Act cannot not be reconciled with the First Amendment to the United States Constitution.  Consequently, Callaghan has made

a strong showing of unconstitutionality that is sufficient to support a finding that Callaghan likely to succeed on the merits.

### E.   CALLAGHAN IS ENTITLED TO A PRELIMINARY INJUNCTION.

As noted above, the four-factor test from *RTAO I* requires a person seeking a preliminary injunction to establish:

> [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

*RTAO I,* 575 F.3d at 346.  The likelihood of success on the merits is addressed above.  The remaining elements are also met in this case.

The threat that Callaghan's independent expenditures and candidate contributions will trigger additional funds to Loughry have chilled Callaghan's speech as Callaghan does not wish for his expenditures to result in additional taxpayer funds for Loughery. This Court has addressed this factor in the context of campaign finance statues and has consistently held:

> "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir.2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). And "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Id.* (citing *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir.2004)).

*Stay the Course West Virginia v. Tennant*, 2012 WL 3263623, 7  (S.D.W.Va. 2012); *Center for Individual Freedom, Inc. v. Ireland*, 613 F.Supp.2d 777, 806 (S.D.W.Va. 2009); *Center for Individual Freedom, Inc. v. Ireland*, 2008 WL 1837324, 5 (S.D.W.Va. 2008); *West Virginians for Life, Inc. v. Smith*, 919 F.Supp. 954, 958 (S.D.W.Va. 1996).  It is clear that this element has been established.

Given the strong showing of likelihood of Callaghan's success, the balance of equities clearly favors granting the injunctions. The public and the Defendants are "in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302 -303 (4th Cir. 2011); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (same; noting "[i]f anything, the system is improved by such an injunction" precluding the enforcement of an unconstitutional statute); *see also Stay the Course West Virginia, supra* (same). Likewise, Loughry had no reasonably expectation of receiving the additional funds when he entered the program after *Bennett* and after the Defendants publicly indicated that they were not going to implement the challenged provisions.

And finally, "upholding constitutional rights is in the public interest." *Legend Night Club*, 637 F.3d at 303 (4th Cir. 2011); *Giovani Carandola, Ltd.* 303 F.3d at 521 ("we agree with the district court that upholding constitutional rights surely serves the public interest.); *Stay the Course, supra* ("Finally, there is a significant public interest in upholding the free speech principles that are integral to our democratic society.").

Thus, as all of the elements necessary for preliminary relief have been met, this Court should grant a preliminary injunction.

## CONCLUSION

Loughry and the Defendants fail to recognize the five opinions of the United States Supreme Court which conclusively establish that the additional funds

provisions of the Act do not survive constitutional scrutiny. Based upon the harms to Callaghan and the public, this Court should enjoin the implementation of these challenged provisions.

**MICHAEL CALLAGHAN**
**By Counsel**

s/ Anthony J. Majestro
Anthony J. Majestro (WVSB 5165)
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P1200
Charleston, WV 25301
Phone: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

Paul T. Farrell (WVSB 7443)
Greene Ketchum Bailey Walker Farrell & Tweel
PO Box 2389
Huntington, WV 25724-2389
Phone: 304-525-9115
Fax: 304-529-3284
paul@greeneketchum.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

MICHAEL CALLAGHAN,

      Plaintiff,

v.                            Civil Action No. 2:12-cv-03419

NATALIE E. TENNANT, in her
official capacity as West Virginia
Secretary of State; NATALIE E. TENNANT,
GARY A. COLLIAS, WILLIAM N. RENZELLI,
and ROBERT RUPP in their official capacities
as members of the West Virginia State
Election Commission,

      Defendants.

## CERTIFICATE OF SERVICE

      The undersigned counsel, counsel for the Plaintiff, does hereby certify that on the 22nd day of August, 2012, I electronically filed the foregoing **Plaintiff's Memorandum in Support of Plaintiff's Motion for Preliminary Injunction** with the Clerk of the Court by utilizing the CM/ECF system, which will send electronic notification of said filing to counsel of record.

Marc E. Williams, Esq.
Randall L. Saunders, Esq.
Jenna E. Hess, Esq.
Nelson Mullins Riley & Scarborough, LLP
949 Third Avenue, Suite 200
Huntington, WV 25701
marc.williams@nelsonmullins.com

Silas B. Taylor, Esq.
Managing Deputy Attorney General
Office of the Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
silasbtaylor1@gmail.com

J. Adam Skaggs, Esq.
Matthew Mendendez, Esq.
Brennan Center for Justice
  at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013

                         **s/ Anthony J. Majestro**
                         Anthony J. Majestro (WVSB 5165)